Barry I. Levy, Esq.
Max Gershenoff, Esq.
Steven Henesy, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
barry.levy@rivkin.com
max.gershenoff@rivkin.com
steven.henesy@rivkin.com
*Counsel for Plaintiffs Government Employees Insurance
Company, GEICO Indemnity Company, GEICO General Insurance
Company, and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| GOVERNMENT EMPLOYEES INSURANCE CO., GEICO INDEMNITY CO., GEICO GENERAL INSURANCE COMPANY and GEICO CASUALTY CO., <br><br> Plaintiffs, <br><br> –against– <br><br> ACTIVE MEDICAL CARE, P.C., NJ PAIN & SPINE, PC, and EDNAN SHEIKH, M.D., <br><br> Defendants. | Docket No.: _____ ( ) <br><br> **Plaintiffs Demand a Trial by Jury** |

## COMPLAINT

Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General

Insurance Company and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), as and for

their Complaint against the Defendants, hereby allege as follows:

## NATURE OF THE ACTION

1.    This action seeks to recover more than $950,000.00 in damages sustained by

Plaintiffs as the result of the Defendants' submission of thousands of fraudulent and unlawful no-

fault insurance claims through Active Medical Care, P.C. ("Active Medical") and NJ Pain & Spine PC ("NJ Pain") for purported examinations, drug screens, pain management injections, electrodiagnostic ("EDX") testing, and related health care services (collectively the "Fraudulent Services"). The Fraudulent Services purportedly were provided to individuals who claimed to have been involved in automobile accidents and were eligible for coverage under GEICO no-fault insurance policies ("Insureds").

2.       In particular, and as set forth below: (i) Defendant Ednan Sheikh, M.D. ("Sheikh") unlawfully operated NJ Pain in New York, despite the fact that it was a New Jersey entity that lacked the requisite authority to operate as a medical practice in New York; (ii) Sheikh and NJ Pain paid unlawful compensation in exchange for patient referrals; (iii) Sheikh and Active Medical engaged in an unlawful pattern of self-referrals; and (iv) Sheikh, NJ Pain, and Active Medical otherwise misrepresented the nature, extent, results, and medical necessity of their purported healthcare services, and whether they were entitled to receive no-fault insurance reimbursement in the first instance.

3.       The Defendants fall into the following categories:

(i)       Defendant NJ Pain is a New Jersey professional corporation through which many of the Fraudulent Services were provided and were billed to insurance companies, including GEICO, in New York and New Jersey.

(ii)      Defendant Active Medical is a New York professional corporation through which many of the Fraudulent Services were provided and were billed to insurance companies, including GEICO, in New York and New Jersey.

(iii)     Defendant Sheikh resides in and is a citizen of New Jersey and was licensed to practice medicine in New York in 2009, and in New Jersey in 2010. Sheikh owns

and controls NJ Pain and Active Medical, purported to perform many of the Fraudulent Services at NJ Pain and Active Medical in both New York and New Jersey, and used NJ Pain and Active Medical as a vehicle to submit fraudulent and unlawful no-fault insurance billing to GEICO and other insurers in New York and New Jersey.

4.      As discussed below, the Defendants at all relevant times have known that:

(i)      the Defendants paid unlawful compensation in exchange for patient referrals;

(ii)     the Defendants engaged in an unlawful self-referral scheme;

(iii)    the Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; and

(iv)    the Fraudulent Services were not provided in compliance with relevant laws and regulations governing health care practice and licensing laws and, as a result, were not eligible for no-fault reimbursement in the first instance.

5.      As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that they billed or caused to be billed to GEICO.

## THE PARTIES

### I.    Plaintiffs

6.      Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is

authorized to conduct business and to issue automobile insurance policies in New York and New Jersey.

## II.  **Defendants**

7.      Defendant Active Medical is a New York medical professional corporation with its principal place of business in New York. Active Medical was incorporated in New York on or about May 14, 2014, and was used by Sheikh as a vehicle to submit fraudulent and unlawful no-fault insurance billing to GEICO and other insurance companies in New York and New Jersey.

8.      Defendant NJ Pain is a New Jersey medical professional corporation with its principal place of business in New Jersey. NJ Pain was incorporated in New Jersey on or about July 19, 2011, and was used by Sheikh as a vehicle to submit fraudulent and unlawful no-fault insurance billing to GEICO and other insurance companies in New York and New Jersey.

9.      Defendant Sheikh resides in and is a citizen of New Jersey, and was licensed to practice medicine in New York in 2009 and in New Jersey in 2010. Sheikh owns and controls NJ Pain and Active Medical, purported to perform many of the Fraudulent Services at NJ Pain and Active Medical, and used NJ Pain and Active Medical as a vehicle to submit fraudulent and unlawful no-fault insurance billing to GEICO and other insurance companies in New York and New Jersey.


## JURISDICTION AND VENUE

10.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds the jurisdictional threshold of $75,000.00, and is between citizens of different states.

11.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

12.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

13.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of this complaint occurred.

14.     For example, the Defendants submitted or caused to be submitted a large amount of fraudulent billing to GEICO in New York, under New York automobile insurance policies, for treatment that they purported to provide to GEICO's New York-based Insureds, typically in the Eastern District of New York. In reliance on the fraudulent and unlawful claims, personnel at a GEICO office in the Eastern District of New York issued payment on the claims.

15.     What is more, and as set forth herein, the Defendants transacted and solicited substantial business in New York, derived a substantial amount of revenue based on their fraudulent and unlawful business activities in New York, and committed tortious acts that caused injury to GEICO in New York.

## ALLEGATIONS COMMON TO ALL CLAIMS

16.     GEICO underwrites automobile insurance in New York and New Jersey.

**I.     An Overview of the Pertinent Law Governing No-Fault Insurance Reimbursement**

**A.     Pertinent New York Law Governing No-Fault Insurance Reimbursement**

17.    New York's no-fault insurance laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need.

18.    Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.), automobile insurers are required to provide no-fault insurance benefits ("Personal Injury Protection" or "PIP Benefits") to Insureds.

19.    In New York, PIP Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for health care goods and services.

20.    In New York, an Insured can assign their right to PIP Benefits to health care goods and services providers in exchange for those services.

21.    In New York, pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3") or by using the Health care Financing Administration insurance claim form (known as the "HCFA-1500 form" or "CMS-1500 form").

22.    Pursuant to the New York no-fault insurance laws, health care services providers are not eligible to bill for or to collect PIP Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services, or if they fail to meet the applicable licensing requirements in any other states in which such services are performed.

23.    For instance, the implementing regulation adopted by the New York Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet <u>any</u> applicable New York State or local licensing requirement necessary to perform such service in New York or meet <u>any</u> applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

24.    Pursuant to the New York Education Law, foreign medical professional entities operating in New York must apply for authority to do business in New York and must have a certificate of authority from the New York Department of Education. <u>See</u>, <u>e.g.</u>, N.Y. Educ. Law §§ 6509(8), 6530(12), N.Y. Bus. Corp. Law §§ 1503, 1514, 1530.

25.    Foreign medical professional entities that operate in New York without obtaining the requisite certificate of authority and authorization are not eligible to receive PIP Benefits.

26.    New York law prohibits licensed health care services providers, including licensed physicians and chiropractors, from paying or accepting compensation in exchange for patient referrals. <u>See</u>, <u>e.g.</u>, New York Education Law §§ 6509-a; 6530; 6531; <u>see</u> <u>also</u> 8 N.Y.C.R.R. § 29.1. Therefore, a health care provider that pays or receives kickbacks or unlawful compensation in exchange for patient referrals is not eligible to receive PIP Benefits.

27.    Pursuant to N.Y. Public Health Law § 238-a(1)(a), health care practitioners are prohibited from referring patients to a clinical laboratory where the practitioner or the practitioner's immediate family has a financial relationship with the clinical laboratory, subject to limited exceptions not applicable here.

28.    At the same time, N.Y. Public Health Law § 238-a(1)(b) prohibits clinical laboratories from submitting bills or claims to an insurer for services provided pursuant to an unlawful referral.

29.     More generally, New York law prohibits licensed health care services providers, including physicians, from referring patients to health care practices in which they have an ownership or investment interest unless: (i) the ownership or investment interest is disclosed to the patient; and (ii) the disclosure informs the patient of his or her "right to utilize a specifically identified alternative health care provider if any such alternative is reasonably available". See New York Public Health Law § 238-d.

30.     Health care providers that engage in unlawful self-referrals are not entitled to collect PIP Benefits.

31.     In New York, claims for PIP Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

32.     When a health care services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

33.     Pursuant to New York Insurance Law § 403, the NF-3 and HCFA-1500 forms submitted by a health care services provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

**B.      Pertinent New Jersey Law Governing No-Fault Insurance Reimbursement**

34.      New Jersey also has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries.  The statutory system is embodied within the Compulsory Insurance Law (N.J.S.A. 39:6B–1 to 3) and the Automobile Reparation Reform Act (N.J.S.A. 39:6A–1 et seq.), which require automobile insurers to provide PIP Benefits to Insureds.

35.      Under the New Jersey no-fault laws, an Insured can assign his or her right to PIP Benefits to health care services providers in exchange for those services. Pursuant to such an assignment, a health care services provider may submit claims directly to an insurance company in order to receive payment for medically necessary services, using the required claim forms, including the HCFA–1500 form.

36.      In order for a health care services provider to be eligible to receive PIP Benefits under the New Jersey no-fault laws, it must comply with all significant laws and regulations governing health care practice.

37.      Thus, a health care services provider is not entitled to receive PIP Benefits where it has failed to comply with all significant statutory and regulatory requirements governing health care practice, whether or not the underlying services were medically necessary or actually provided.

38.      Moreover, in order for a specific health care service to be eligible for PIP reimbursement, the service itself must be provided in compliance with all significant laws and regulations governing health care practice.

39.     By extension, insurers such as GEICO are not obligated to make any payments of PIP Benefits to health care services providers that are not in compliance with all significant statutory and regulatory requirements governing health care practice.

40.     Furthermore, insurers such as GEICO are not obligated to make any payments of PIP Benefits for health care services that are not rendered in compliance with all significant statutory and regulatory requirements governing health care practice.

41.     Pursuant to N.J.A.C. 13:35-6.16 and N.J.S.A 14A:17-5, a foreign professional corporation may not lawfully operate as a medical practice in New Jersey.

42.     Insurers are not required to pay PIP Benefits for health care services that are unlawfully provided in New Jersey through foreign professional corporations.

43.     Pursuant to N.J.A.C. 13:35-6.17, physicians are prohibited from paying or receiving compensation, either directly or indirectly, in exchange for patient referrals.

44.     Among other things, N.J.A.C. 13:35-6.17(c)(1) specifies that:

A licensee shall not, directly or indirectly, give to or receive from any licensed or unlicensed source a gift of more than nominal (negligible) value, or any fee, commission, rebate or bonus or other compensation however denominated, which a reasonable person would recognize as having been given or received in appreciation for or to promote conduct by a licensee including: purchasing a medical product, ordering or promoting the sale or lease of a device or appliance or other prescribed item, prescribing any type of item or product for patient use or making or receiving a referral to or from another for professional services. For example, a licensee who refers a patient to a health care service (such as a cardiac rehabilitation service or a provider of durable medical equipment or a provider of testing services) shall not accept from nor give to the health care service a fee directly or indirectly in connection with the referral, whether denominated as a referral or prescription fee or examination or supervision fee or space leasing in which to render the services (other than as permitted in (h) below), or by any other name ….

(Emphasis added).

45.     N.J.A.C. 13:35-6.17(c)(1)(ii) specifies that "[t]his section shall be construed broadly to effectuate its remedial intent."

46.      Therefore, physicians and medical practices that pay or receive compensation in exchange for patient referrals are not eligible to receive PIP Benefits.

47.      In keeping with the broad anti-kickback prohibitions in N.J.A.C. 13:35-6.17(c)(1), N.J.A.C. 13:35-6.17(h) provides, in pertinent part, that:

> A Board licensee may lease space or medical equipment to or from another licensed health care professional to whom patients are referred, only where rent is a fixed fee set in advance and determined by the fair market value, or less, and is for a regular term and not for sporadic use of the space or equipment.

(Emphasis added).

48.      In New Jersey, physicians generally may not refer patients to a health care provider in which they, or their immediate family, have a significant beneficial interest. Specifically, N.J.S.A. 45:9-22.5 (the "Codey Law") provides that:

> A practitioner shall not refer a patient or direct an employee of the practitioner to refer a patient to a health care service in which the practitioner, or the practitioner's immediate family, or the practitioner in combination with the practitioner's immediate family has a significant beneficial interest . . ..

49.      Pursuant to N.J.S.A. 45:9-22.4:

> Health care service" means a business entity which provides on an inpatient or outpatient basis: testing for or diagnosis or treatment of human disease or dysfunction; or dispensing of drugs or medical devices for the treatment of human disease or dysfunction. Health care service includes, but is not limited to, a bioanalytical laboratory, pharmacy, home health care agency, rehabilitation facility, nursing home, hospital, or a facility which provides radiological or other diagnostic imagery services, physical therapy, ambulatory surgery, or ophthalmic services.

> "Practitioner" means a physician, chiropractor or podiatrist licensed pursuant to Title 45 of the Revised Statutes.

> "Significant beneficial interest" means any financial interest; but does not include ownership of a building wherein the space is leased to a person at the prevailing rate under a straight lease agreement, or any interest held in publicly traded securities.

50.      Pursuant to N.J.S.A. 45:9–22–5(c)(1), the Codey Law's restrictions on patient referrals do not apply to:

medical treatment or a procedure that is provided at the practitioner's medical office and for which a bill is issued directly in the name of the practitioner or the practitioner's medical office ….

51.    Pursuant to N.J.S.A. 45:9-22-5(c)(3), the Codey Law's restrictions on patient referrals also do not apply to self-referrals for procedures to be performed at an ambulatory care facility – such as an ambulatory surgery center – so long as certain conditions are met (the "ASC Exception").

52.    Specifically, at all relevant times, pursuant to the ASC Exception in N.J.S.A. 45:9-22-5(c)(3), the Codey Law's restrictions on patient self-referrals did not apply to:

> ambulatory surgery or procedures involving the use of anesthesia performed at a surgical practice registered with the Department of Health . . . or at an ambulatory care facility licensed by the Department of Health to perform surgical and related services or lithotripsy services, if the following conditions are met:
>
> (a)    the practitioner who provided the referral personally performs the procedure;
>
> (b)    the practitioner's remuneration as an owner of or investor in the practice or facility is directly proportional to the practitioner's ownership interest and not to the volume of patients the practitioner refers to the practice or facility;
>
> (c)    all clinically-related decisions at a facility owned in part by non-practitioners are made by practitioners and are in the best interests of the patient; and
>
> (d)    disclosure of the referring practitioner's significant beneficial interest in the practice or facility is made to the patient in writing, at or prior to the time that the referral is made, consistent with the provisions of section 3 of P.L. 1989, c. 19 (C.45:9-22.6).

53.    Physicians and medical practices which engage in self-referral arrangements that violate the Codey Law are not eligible to receive PIP Benefits.

54.    Pursuant to N.J.S.A. 39:6A-4, an insurer such as GEICO is only required to pay PIP Benefits for reasonable, necessary, and appropriate treatment. At the same time, a health care provider in New Jersey is only eligible to receive PIP Benefits for medically necessary services.

55.     Pursuant to N.J.S.A. 39:6A-2(m):

"Medically necessary" means that the treatment is consistent with the symptoms or diagnosis, and treatment of the injury:

(1)     is not primarily for the convenience of the injured person or provider,

(2)     is the most appropriate standard or level of service which is in accordance with standards of good practice and standard professional treatment protocols, as such protocols may be recognized or designated by the Commissioner of Banking and Insurance, in consultation with the Commissioner of Health and Senior Services or with a professional licensing or certifying board in the Division of Consumer Affairs in the Department of Law and Public Safety, or by a nationally recognized professional organization, and

(3)     does not involve unnecessary diagnostic testing.

56.     Like New York, New Jersey has established a medical fee schedule (the "NJ Fee Schedule") that is applicable to claims for PIP Benefits.

57.     When a health care services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the NJ Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

**II.     The Defendants' Fraudulent Scheme**

58.     Beginning no later than 2017, and continuing through the present day, the Defendants conceived and implemented a fraudulent scheme in which they caused a large amount of fraudulent and unlawful PIP billing to be submitted to GEICO for medically unnecessary, illusory, unlawful, and otherwise non-reimbursable services in New York and New Jersey.

A.    **NJ Pain's Illegal Operations in New York**

59.    As set forth above, NJ Pain is a New Jersey medical professional corporation, not a New York medical professional corporation.

60.    As set forth above, pursuant to 11 N.Y.C.R.R. § 65-3.16(a)(12), health care services providers are not eligible to collect PIP Benefits if the providers fail "to meet any applicable New York State or local licensing requirement necessary to perform such service in New York …."

61.    Pursuant to the New York Education Law, medical professional corporations operating in New York must have a certificate of authority from the New York Department of Education, and must be properly authorized to do business in New York. See, e.g., N.Y. Educ. Law §§ 6509, 6530; N.Y. Bus. Corp. Law §§ 1503, 1514.

62.    NJ Pain never obtained a certificate of authority from the New York Education Department and was never incorporated in New York.

63.    Searches of the New York Department of State Division of Corporations website indicate that NJ Pain has only recently received authority to conduct business in New York as a foreign professional service corporation on May 31, 2023.

64.    However, searches of the New York Education Department's Office of the Professions website indicate that NJ Pain never received any certificate of authority from the New York Education Department.

65.    Even so, Sheikh and NJ Pain routinely and unlawfully operated NJ Pain as a medical practice in New York.

66.    For example:

(i)    On or about April 9, 2018, NJ Pain and Sheikh billed GEICO for an examination purportedly provided through NJ Pain to an Insured named LT at 440 Audubon Avenue, New York, New York despite the fact that NJ Pain and Sheikh were ineligible to receive PIP Benefits in connection with the putative examination.

(ii)     On or about July 29, 2019, NJ Pain and Sheikh billed GEICO for an examination purportedly provided through NJ Pain to an Insured named DC at 440 Audubon Avenue, New York, New York despite the fact that NJ Pain and Sheikh were ineligible to receive PIP Benefits in connection with the examination.

(iii)    On or about July 29, 2019, NJ Pain and Sheikh billed GEICO for an examination purportedly provided through NJ Pain to an Insured named DM at 440 Audubon Avenue, New York, New York despite the fact that NJ Pain and Sheikh were ineligible to receive PIP Benefits in connection with the putative examination.

(iv)     On or about September 16, 2019, NJ Pain and Sheikh billed GEICO for an examination purportedly provided through NJ Pain to an Insured named CD at 440 Audubon Avenue, New York, New York despite the fact that NJ Pain and Sheikh were ineligible to receive PIP Benefits in connection with the putative examination.

(v)      On or about September 16, 2019, NJ Pain and Sheikh billed GEICO for an examination purportedly provided through NJ Pain to an Insured named NS at 440 Audubon Avenue, New York, New York despite the fact that NJ Pain and Sheikh were ineligible to receive PIP Benefits in connection with the putative examination.

(vi)     On or about September 16, 2019, NJ Pain and Sheikh billed GEICO for an examination purportedly provided through NJ Pain to an Insured named LP at 440 Audubon Avenue, New York, New York despite the fact that NJ Pain and Sheikh were ineligible to receive PIP Benefits in connection with the putative examination.

(vii)    On or about March 6, 2020, NJ Pain and Sheikh billed GEICO for an examination purportedly provided through NJ Pain to an Insured named JS at 92-05 Rockaway Boulevard, Ozone Park, New York despite the fact that NJ Pain and Sheikh were ineligible to receive PIP Benefits in connection with the putative examination.

(viii)   On or about June 4, 2020, NJ Pain and Sheikh billed GEICO for an injection purportedly provided through NJ Pain to an Insured named HB at 440 Audubon Avenue, New York, New York despite the fact that NJ Pain and Sheikh were ineligible to receive PIP Benefits in connection with the injection.

(ix)     On or about June 16, 2020, NJ Pain and Sheikh billed GEICO for an examination purportedly provided through NJ Pain to an Insured named EB at 92-05 Rockaway Boulevard, Ozone Park, New York, despite the fact that NJ Pain and Sheikh were ineligible to receive PIP Benefits in connection with the nerve injection.

(x)      On or about November 9, 2020, NJ Pain and Sheikh billed GEICO for an ultrasound guidance needle placement purportedly provided through NJ Pain to an Insured named JV at 168-36 Jamaica Ave, Jamaica, New York, despite the fact that NJ Pain and Sheikh were ineligible to receive PIP Benefits in connection with the ultrasound guidance needle placement.

(xi)     On or about November 23, 2020, NJ Pain and Sheikh billed GEICO for an examination purportedly provided through NJ Pain to an Insured named HB at 168-

15

36 Jamaica Avenue, Jamaica, New York, despite the fact that NJ Pain and Sheikh were ineligible to receive PIP Benefits in connection with the putative examination.

(xii)    On or about November 23, 2020, NJ Pain and Sheikh billed GEICO for an injection purportedly provided through NJ Pain to an Insured named RT at 168-36 Jamaica Avenue, Jamaica, New York, despite the fact that NJ Pain and Sheikh were ineligible to receive PIP Benefits in connection with the injection.

(xiii)    On or about January 22, 2021, NJ Pain and Sheikh billed GEICO for an examination purportedly provided through NJ Pain to an Insured named SV at 168-36 Jamaica Avenue, Jamaica, New York, despite the fact that NJ Pain and Sheikh were ineligible to receive PIP Benefits in connection with the putative examination.

(xiv)    On or about January 22, 2021, NJ Pain and Sheikh billed GEICO for an office outpatient visit purportedly provided through NJ Pain to an Insured named JV at 168-36 Jamaica Avenue, Jamaica, New York, despite the fact that NJ Pain and Sheikh were ineligible to receive PIP Benefits in connection with the putative examination.

(xv)    On or about January 27, 2021, NJ Pain and Sheikh billed GEICO for an examination purportedly provided through NJ Pain to an Insured named FG at 168-36 Jamaica Avenue, Jamaica, New York, despite the fact that NJ Pain and Sheikh were ineligible to receive PIP Benefits in connection with the putative examination.

67.    These are only representative examples. All the claims for Fraudulent Services identified in Exhibit "1" for services that purportedly were provided in New York were provided in violation of New York law, because NJ Pain lacked the authority to operate as a medical practice in New York.

**B.    The Multidisciplinary Clinics and Unlawful Compensation in Exchange for Patient Referrals**

68.    In order to bill GEICO and other automobile insurers for initial examinations, follow up examinations, pain management injections, and other services, NJ Pain and Sheikh needed to obtain patient referrals from other health care providers.

69.    However, NJ Pain and Sheikh did not advertise or market NJ Pain's services to the general public, did not maintain a consistent schedule at any one location, were not the owners of or the leaseholders of the real property from which they purported to provide many of the

16

Fraudulent Services, and did not engage in any legitimate efforts to build a reputation or goodwill among legitimate referral sources.

70.     Instead, NJ Pain and Sheikh operated on a transient basis from a large number of multidisciplinary clinics located throughout New York and New Jersey (the "No-Fault Clinics") that purported to provide treatment to patients with no-fault insurance, including but not limited to No-Fault Clinics at the following locations:

(i)      92-05 Rockaway Boulevard, Ozone Park, New York

(ii)     440 Audubon Avenue, New York, New York

(iii)    154 Stelton Road, Piscataway, New Jersey

(iv)     168-36 Jamaica Avenue, Jamaica, New York

(v)      679 Montgomery Street, Jersey City, New Jersey

(vi)     631 Grand Street, Jersey City, New Jersey

(vii)    448 Boulevard, Hasbrouck Heights, New Jersey

(viii)   1016 McBride Avenue, Woodland Park, New Jersey

(ix)     200 Freeway Drive East, East Orange, New Jersey

(x)      219 Lafayette Avenue, Hawthorne, New Jersey

71.     Though ostensibly organized to provide a range of health care services to Insureds at individual locations, these No-Fault Clinics in actuality were organized to supply convenient, one-stop shops for no-fault insurance fraud.

72.     NJ Pain and Sheikh gained access to the No-Fault Clinics by paying unlawful compensation, in exchange for patient referrals, to other health care services providers (the "Referring Providers") who operated from the No-Fault Clinics and controlled access to the No-Fault Clinics.

73.    The unlawful compensation was paid in the form of untraceable cash, or else was disguised as ostensibly legitimate fees to "lease" space or personnel at the No-Fault Clinics. In fact, these were "pay-to-play" arrangements that caused the Referring Providers at the No-Fault Clinics to provide access to Insureds and to refer the Insureds to NJ Pain and Sheikh for the Fraudulent Services without regard for the medical necessity of any of the Fraudulent Services.

74.    The unlawful compensation also was paid in the form of return referrals from NJ Pain and Sheikh to the Referring Providers for the continued provision of their own medically unwarranted services.

75.    In this context, to the extent that the Insureds in the claims set forth in Exhibit "1" suffered any injuries at all in their automobile accidents, they virtually always were minor soft tissue injuries such as sprains or strains.

76.    Because ordinary soft tissue injuries such as sprains or strains almost always resolve after a short course of conservative treatment, or no treatment at all, the Referring Providers knew that their ability to submit and obtain payment on large amounts of chiropractic, physical therapy, acupuncture, and related billing to GEICO and other automobile insurers would be limited, inasmuch as they would not be able to demonstrate that the Insureds required additional chiropractic, physical therapy, acupuncture, and/or related services beyond an initial short course of conservative treatment.

77.    The Referring Providers also knew that it would be much easier for them to obtain payment on large amounts of PIP insurance billing for medically unnecessary chiropractic, physical therapy, acupuncture, and related services if a licensed physician or physicians were to generate reports and diagnoses that purported to reflect injuries more serious than ordinary strains and sprains.

78.     Accordingly, the Referring Providers entered into secret agreements with NJ Pain and Sheikh, whereby the Referring Providers agreed to refer Insureds to NJ Pain for expensive and medically unnecessary examinations and pain management injections, despite the Insureds' lack of any genuine presenting problems that would warrant the examinations or the injections.

79.     Then, as additional compensation for these medically unnecessary referrals, NJ Pain and Sheikh would falsely report that the Insureds suffered from serious, continuing symptoms as the result of their accidents, and then refer the Insureds back to the Referring Providers for continued medically unnecessary treatment.

80.     What is more, and in keeping with the fact that NJ Pain and Sheikh paid unlawful compensation in exchange for patient referrals, many Insureds identified in Exhibit "1" had yet to fail a legitimate course of conservative treatment before being referred to NJ Pain and Sheikh for pain management services.

81.     In a legitimate clinical setting, referrals for pain management services generally will be improper unless the patient has failed a legitimate course of conservative treatment. This is because soft tissue injuries such as sprains or strains virtually always resolve after a short course of conservative treatment or no treatment at all, and because pain management services, such as injections, tend to be invasive and pose increased risks to patients.

82.     Even so, in the claims identified in Exhibit "1", NJ Pain and Sheikh, pursuant to their unlawful referral scheme, often received medically unnecessary pain management referrals from the Referring Providers long before the patients failed a legitimate course of conservative treatment.

83.     For example:

(i)     On August 4, 2018, an Insured named DM was involved in an automobile accident. The contemporaneous police report indicated that DM's vehicle was drivable

following the accident. The police report further indicated that DM refused medical attention at the scene. In keeping with the fact that DM was not seriously injured, DM did not visit any hospital emergency room following the accident. To the extent that DM experienced any health issues as a result of the accident, they were low or minimal in severity at the outset, and improved over time. Thereafter, DM sought treatment from a No-Fault Clinic located at 200 Freeway Drive East, East Orange, New Jersey between August 10, 2018, and October 25, 2018. In October of 2018, a Referring Provider at the No-Fault Clinic caused DM to be referred to NJ Pain in exchange for unlawful compensation from NJ Pain and Sheikh. Thereafter, on October 25, 2018, Sheikh purported to examine DM on behalf of NJ Pain at the No-Fault Clinic. In the October 25, 2018, examination report, Sheikh falsely contended that DM continued to suffer from high levels of pain as a result of the accident, despite the fact that – by that point – DM had received over two months of chiropractic services from the Referring Provider. Though the chiropractic treatment supposedly had been ineffective in resolving DM's putative symptoms, Sheikh nonetheless referred DM back to the Referring Provider for continued chiropractic treatment at the conclusion of the October 25, 2018, examination. The medically unnecessary return referral to the Referring Provider was unlawful compensation for the Referring Provider's initial, medically unnecessary referral to NJ Pain.

(ii)     On January 23, 2019, an Insured named IS was involved in an automobile accident. The contemporaneous police report indicated that IS's vehicle was drivable following the accident. The police report further indicated that IS was not injured as a result of the accident.  In keeping with the fact that IS was not seriously injured, IS did not visit any hospital emergency room following the accident. To the extent that IS experienced any health issues as a result of the accident, they were low or minimal in severity at the outset, and improved over time. Thereafter, IS sought treatment from a No-Fault Clinic located at 1016 McBride Avenue, Woodland Park, New Jersey, which provided chiropractic treatment to IS between February 2019 and July 2019. In July 2019, a Referring Provider at the No-Fault Clinic caused IS to be referred to NJ Pain in exchange for unlawful compensation from NJ Pain and Sheikh. Thereafter, on July 25, 2019, Sheikh purported to examine IS on behalf of NJ Pain at the No-Fault Clinic. In the July 25, 2019, examination report, Sheikh falsely contended that IS continued to suffer from high levels of pain as the result of the accident, despite the fact that – by that point – IS had received nearly five months of chiropractic services from the Referring Provider. Though the chiropractic treatment that Referring Provider purportedly had provided supposedly had been ineffective in resolving IS' putative symptoms, Sheikh nonetheless referred IS back to Referring Provider for continued chiropractic treatment at the conclusion of the July 25, 2019, examination – nearly six months after the accident, and long after any legitimate symptoms IS may have experienced had resolved. The medically unnecessary return referral to the Referring Provider was unlawful compensation for the Referring Provider's initial, medically unnecessary referral to NJ Pain.

(iii)    On December 24, 2019, an Insured named TL was involved in an automobile accident. According to the contemporaneous police report, TL's vehicle was drivable

following the accident. The report further indicated that TL did not visit any hospital emergency room following the accident. To the extent that TL experienced any health issues as a result of the accident, they were low or minimal in severity at the outset, and improved over time. Thereafter, TL sought treatment from a No-Fault Clinic located at 168-36 Jamaica Avenue, Jamaica, New York, between January 4, 2020, and October 14, 2020. In July 2019, a Referring Provider at the No-Fault Clinic cause TL to be referred to NJ Pain in exchange for unlawful compensation from NJ Pain and Sheikh. Thereafter, on July 25, 2019, Sheikh purported to examine TL on behalf of NJ Pain at the No-Fault Clinic. In the July 25, 2019, examination report, Sheikh falsely contended that TL continued to suffer from high levels of pain as the result of the accident, despite the fact that – by that point – TL had received nearly ten months of chiropractic treatment from the Referring Provider. Though the chiropractic treatment the Referring Provider purportedly had provided supposedly had been ineffective in resolving TL's putative symptoms, Sheikh nonetheless referred TL back to Referring Provider for continued chiropractic treatment at the conclusion of the July 25, 2019, examination – nearly six months after the accident, and long after any legitimate symptoms TL may have experienced had resolved. The medically unnecessary return referral to the Referring Provider was unlawful compensation for the Referring Provider's initial, medically unnecessary referral to NJ Pain.

(iv)     On January 29, 2020, an Insured named EB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision. The police report further indicated that EB was not injured as a result of the accident. In keeping with the fact that EB was not injured, EB did not visit any hospital emergency department following the accident. To the extent that EB experienced any health issues as a result of the accident, they were low or minimal in severity at the outset, and improved over time. Thereafter, EB sought treatment from a No-Fault Clinic located at 92-05 Rockaway Boulevard, Ozone Park, New York beginning on January 31, 2020 – two days after the accident. Thereafter, on March 16, 2020, long before EB could have failed a legitimate course of conservative treatment, Sheikh purported to examine EB on behalf of NJ Pain at the No-Fault Clinic, and referred EB back to the Referring Provider for additional physical therapy and chiropractic treatment. The Referring Provider's initial referral to NJ Pain and Sheikh before EB could have failed a legitimate course of conservative treatment, and the subsequent return referral from NJ Pain and Sheikh to the Referring Provider were products of an unlawful referral agreement.

(v)     On February 3, 2020, an Insured named IS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that IS's vehicle was drivable following the accident. The police report further indicated that IS was not injured as a result of the accident.  In keeping with the fact that IS was not seriously injured, IS did not visit any hospital emergency department following the accident. The extent that IS experienced any health issues as a result of the accident, they were low or minimal in severity at the outset, and improved over time. Thereafter, IS sought treatment from a No-Fault Clinic located at 448 Boulevard, Hasbrouck Heights, New Jersey, beginning on February 6, 2020.

In February 2020, a Referring Provider at the No-Fault Clinic caused IS to be referred to NJ Pain in exchange for unlawful compensation from NJ Pain and Sheikh. Thereafter, on February 19, 2020, long before they could have failed a legitimate course of conservative treatment, Sheikh purported to examine IS on behalf of NJ Pain at the No-Fault Clinic, and referred IS back to the Referring Provider for additional physical therapy and chiropractic treatment. The Referring Provider's initial referral to NJ Pain and Sheikh before IS could have failed a legitimate course of conservative treatment, and the subsequent return referral from NJ Pain and Sheikh to the Referring Provider were products of an unlawful referral agreement.

(vi)     On October 6, 2020, an Insured named JV was involved in an automobile accident. To the extent that JV experienced any health issues as a result of the accident, they were low or minimal in severity at the outset, and improved over time. Thereafter, JV sought treatment from a No-Fault Clinic located at 168-36 Jamaica Avenue, Jamaica, New York, beginning on October 6, 2020, the same day as the accident. One week thereafter, on October 14, 2020, and long before they could have failed a legitimate course of conservative treatment, a Referring Provider caused JV to be referred to NJ Pain and Sheikh for medically unnecessary pain management services. Accordingly, Sheikh purported to examine JV on behalf of NJ Pain at the No-Fault Clinic, and subsequently referred JV to the Referring provider for additional physical therapy and chiropractic treatment. The Referring Provider's referral to NJ Pain and Sheikh before JV could have failed a legitimate course of conservative treatment, and the subsequent return referrals from NJ Pain and Sheikh to the Referring Provider were products of an unlawful referral agreement.

(vii)    On October 6, 2020, an Insureds name SV was involved in an automobile accident. To the extent that SV experienced any health issues as a result of the accident, they were low or minimal in severity at the outset, and improved over time. Thereafter, SV sought treatment from a No-Fault Clinic located at 168-36 Jamaica Avenue, Jamaica, New York, beginning on October 6, 2020, the same day as the accident. One week thereafter, on October 14, 2020, and long before they could have failed a legitimate course of conservative treatment, a Referring Provider caused SV to be referred to NJ Pain and Sheikh for medically unnecessary pain management services. Accordingly, Sheikh purported to examine SV on behalf of NJ Pain at the No-Fault Clinic, and subsequently referred SV to the Referring provider for additional physical therapy and chiropractic treatment. The Referring Provider's initial referral to NJ Pain and Sheikh before SV could have failed a legitimate course of conservative treatment, and the subsequent return referral from NJ Pain and Sheikh to the Referring Provider were products of an unlawful referral agreement.

(viii)   On October 10, 2020, an Insured named JF was involved in an automobile accident. To the extent that Frantz experienced any health issues as a result of the accident, they were low or minimal in severity at the outset, and improved over time. Thereafter, JF sought treatment from a No-Fault Clinic located at 168-36 Jamaica Avenue, Jamaica, New York, beginning on October 12, 2020, two days after the accident. At the conclusion of that visit, the Referring Provider caused JF to be referred to NJ Pain and Sheikh for medically unnecessary pain management services.

On October 14, 2020, long before JF could have failed a legitimate course of conservative treatment, Sheikh purported to examine JF on behalf of NJ Pain at the No-Fault Clinic, and referred JF back to the Referring Provider for additional physical therapy and chiropractic treatment. The Referring Provider's initial referral to NJ Pain and Sheikh before JF could have failed a legitimate course of conservative treatment, and the subsequent return referral from NJ Pain and Sheikh to the Referring Provider were products of an unlawful referral agreement.

(ix)     On March 12, 2021, an Insured named SY was in an automobile accident. The contemporaneous police report indicated that SY was not injured as a result of the accident. In keeping with the fact that SY was not seriously injured, SY did not visit any hospital emergency department following the accident. To the extent that SY experienced any health issues as a result of the accident, they were low or minimal in severity at the outset, and improved over time. Thereafter, SY sought treatment from a No-Fault Clinic located at 154 Stelton Road, Piscataway, New Jersey beginning on or about March 30, 2021. Just over one month later, on May 6, 2021 – long before SY could have failed a legitimate course of conservative treatment - a Referring Provider at the No-Fault Clinic caused SY to be referred to NJ Pain and Sheikh for medically unnecessary pain management services. Accordingly, Sheikh purported to examine SY on behalf of NJ Pain at the No-Fault Clinic, and referred SY back to the Referring provider for additional physical therapy and chiropractic treatment. The Referring Provider's initial referral to NJ Pain and Sheikh before SY could have failed a legitimate course of conservative treatment, and the subsequent return referral from NJ Pain and Sheikh to the Referring Provider were products of an unlawful referral agreement.

(x)     On June 27, 2022, and Insured named ER was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision. To the extent that ER experienced any health issues as a result of the accident, they were low or minimal in severity at the outset, and improved over time. Thereafter, ER sought treatment from a No-Fault Clinic located at 154 Stelton Road, Piscataway, New Jersey beginning on June 30, 2022, three days after the accident. Thereafter, on June 30, 2022 – long before they could have failed a legitimate course of conservative treatment – a Referring Provider caused ER to be referred to NJ Pain and Sheikh for pain management services. Still on June 30, 2022, Sheikh purported to examine ER on behalf of NJ Pain at the No-Fault Clinic, and subsequently referred ER back to the Referring Provider for additional physical therapy and chiropractic treatment. The Referring Provider's initial referral to NJ Pain and Sheikh before ER could have failed a legitimate course of conservative treatment, and the subsequent return referral from NJ Pain and Sheikh to the Referring Provider were products of an unlawful referral agreement.

84.     These are only representative examples. In the claims identified in Exhibits Exhibit "1", the Defendants routinely and unlawfully paid and received unlawful compensation in exchange for patient referrals.

**C.      The Fraudulent Charges for Initial Examinations**

85.      Upon receiving a referral pursuant to the unlawful compensation in exchange for patient referrals that NJ Pain and Sheikh paid to the Referring Providers at the No-Fault Clinics, NJ Pain and Sheikh purported to provide virtually every Insured in the claims identified in Exhibit "1" with an initial examination.

86.      As set forth in Exhibit "1", Sheikh purported to perform the majority of putative initial examinations on behalf of NJ Pain, which NJ Pain and Sheikh billed to GEICO using CPT codes 99204 and 99244, typically resulting in charges between $550.00 and $1,250.00 for each purported examination.

87.      The charges for the initial examinations were fraudulent in that the initial examinations were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the unlawful compensation that NJ Pain and Sheikh paid to the Referring Providers at the No-Fault Clinics, not to treat or otherwise benefit the Insureds.

88.      The charges for the initial examination also were fraudulent in that they misrepresented NJ Pain's eligibility to receive PIP Benefits in the first instance. In fact, NJ Pain never was eligible to receive PIP Benefits in the first instance, because of the fraudulent and unlawful conduct described herein.

89.      In addition, the charges for the initial examinations were fraudulent in that they misrepresented the nature, extent, and results of the purported examinations.

**1.      Misrepresentation Regarding the Severity of the Insureds' Presenting Problems**

90.      In the claims for initial examinations that are identified in Exhibit "1", NJ Pain and Sheikh routinely misrepresented the severity of the Insureds' presenting problems.

91.     Pursuant to the American Medical Association's CPT Assistant, which is incorporated by reference into the NY and NJ Fee Schedule, the use of CPT code 99204 or 99244 to bill for an initial patient examination typically required that the patient present with problems of moderate to high severity.

92.     The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT codes 99204 and 99244 to bill for an initial patient examination.

93.     For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99204 to bill for an initial patient examination:

(i)     Office visit for initial evaluation of a 63-year-old male with chest pain on exertion. (Cardiology/Internal Medicine)

(ii)    Initial office visit of a 50-year-old female with progressive solid food dysphagia. (Gastroenterology)

(iii)   Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion. (Internal Medicine)

(iv)    Initial office visit for 34-year-old patient with primary infertility, including counseling. (Obstetrics/Gynecology)

(v)     Initial office visit for 7-year-old female with juvenile diabetes mellitus, new to area, past history of hospitalization times three. (Pediatrics)

(vi)    Initial office evaluation of 70-year-old female with polyarthralgia. (Rheumatology)

(vii)   Initial office evaluation of a 50-year-old male with an aortic aneurysm with respect to recommendation for surgery. (Thoracic Surgery)

94.     Likewise, the CPT Assistant provides the following clinical examples of presenting problems that support the use of CPT code 99244 to bill for an initial patient examination:

(i)     Office consultation with 38-year-old female, with inflammatory bowel disease, who now presents with right lower quadrant pain and suspected intra-abdominal abscess. (MC and Rectal Surgery)

(ii)    Initial office consultation for discussion of treatment options for a 40-year-old female with a two-centimeter adenocarcinoma of the breast. (Radiation Oncology)

(iii)    Initial office consultation with 72-year-old male with esophageal carcinoma, symptoms of dysphagia and reflux. (Thoracic Surgery)

95.    Accordingly, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT codes 99244 or 99204 to bill for an initial patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

96.    By contrast, to the extent that the Insureds in the claims identified in Exhibit "1" had any presenting problems at all as the result of their automobile accidents, the problems virtually always were low or minimal severity soft tissue injuries such as sprains and strains.

97.    For instance, and in keeping with the fact that the Insureds in the claims identified in Exhibit "1" either had no presenting problems at all as the result of their automobile accidents, or else problems of low or minimal severity, in the majority of the claims identified in Exhibit "1" the Insureds did not seek treatment at any hospital as the result of their accidents.

98.    To the limited extent that the Insureds did report to a hospital after their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way after a few hours with, at most, a minor sprain or strain and/or similar soft-tissue injury diagnosis.

99.    Furthermore, in many cases, contemporaneous police reports indicated that the underlying accidents involved low-speed, low-impact collisions, that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the underlying accidents or injured at all.

100.    Even so, in the claims for initial examinations identified in Exhibit "1", NJ Pain and Sheikh routinely billed for their putative initial examinations using CPT codes 99204 or 99244

and thereby falsely represented that the Insureds presented with problems of moderate to high severity.

101. For example:

(i) On May 25, 2018, an Insured named AZ was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision. The police report further indicated that AZ was not injured as a result of the accident. In keeping with the fact that AZ was not injured, AZ did not visit any hospital emergency department following the accident. To the extent that AZ experienced any health issues as a result of the accident, they were low or minimal in severity at the outset, and improved over time. Even so, at the end of the purported initial examination on August 28, 2018, NJ Pain and Sheikh billed GEICO for the initial examination using CPT code 99204 and therefore falsely represented that the initial examination involved presenting problems of moderate to high severity.

(ii) On June 5, 2018, an Insured named MI was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision. MI did not visit any hospital emergency department following the accident. To the extent that MI experienced any health issues as a result of the accident, they were low or minimal in severity at the outset, and improved over time. Even so, at the end of the purported initial examination on August 14, 2018, NJ Pain and Sheikh billed GEICO for the initial examination using CPT code 99204 and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(iii) On September 8, 2018, an Insured named MP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision. The police report further indicated that MP refused medical attention at the scene. In keeping with the fact that MP was not seriously injured, MP did not visit any hospital emergency department following the accident. To the extent that MP experienced any health issues as a result of the accident, they were low or minimal in severity at the outset, and improved over time. Even so, at the end of the purported initial examination on October 24, 2019, NJ Pain and Sheikh billed GEICO for the initial examination using CPT code 99244 and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(iv) On January 23, 2019, an Insured named IS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that IS's vehicle was drivable following the accident. The police report further indicated that IS was not injured as a result of the accident. In keeping with the fact that IS was not seriously injured, IS did not visit any hospital emergency department following the accident. To the extent that IS experienced any health issues as a result of the accident, they were low or minimal in severity at the

outset, and improved over time. Even so, at the end of the purported initial examination on July 25, 2019, NJ Pain and Sheikh billed GEICO for the initial examination using CPT code 99244 and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(v)     On August 4, 2019, an Insured named DM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that DM's vehicle was drivable following the accident. The police report further indicated that DM refused medical attention at the scene. In keeping with the fact that DM was not seriously injured, DM did not visit any hospital emergency department following the accident. To the extent that DM experienced any health issues as a result of the accident, they were low or minimal in severity at the outset, and improved over time. Even so, at the end of the purported initial examination on October 25, 2018, NJ Pain and Sheikh billed GEICO for the initial examination using CPT code 99204 and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(vi)    On January 29, 2020, and Insured named SA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision and that SA's vehicle was drivable following the accident. The police report further indicated that SA was not injured as a result of the accident and that SA refused medical treatment. In keeping with the fact that SA was not injured, SA did not visit any hospital emergency department following the accident. To the extent that SA experienced any health issues as a result of the accident, they were low or minimal in severity at the outset, and improved over time. Even so, at the end of the purported initial examination on October 5, 2020, NJ Pain and Sheikh billed GEICO for the initial examination using CPT code 99244 and therefore falsely represented that the initial examination involved presenting problems of moderate to high severity.

(vii)   On February 3, 2020, an insured named IS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that IS's vehicle was drivable following the accident. The police report further indicated that IS was not injured as a result of the accident. In keeping with the fact that IS was not seriously injured, IS did not visit any hospital emergency department following the accident. To the extent that IS experienced any health issues as a result of the accident, they were low or minimal in severity at the outset, and improved over time. Even so, at the end of the purported initial examination on February 19, 2020, NJ Pain and Sheikh billed GEICO for the initial examination using CPT code 99244 and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(viii)  On July 2, 2020, an insured named JW was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JW's vehicle was drivable following the accident. The police report further indicated that JW was not injured in the accident and refused medical attention. In keeping with the fact that JW was not seriously injured, JW

did not visit any hospital emergency department following the accident. What is more, JW's car suffered no visible damage as a result of the accident. To the extent that JW experienced any health issues as a result of the accident, they were low or minimal in severity at the outset, and improved over time. Even so, at the end of the initial examination on October 1, 2020, NJ Pain and Sheikh billed GEICO for the initial examination using CPT code 99244 and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(ix)    On January 29, 2020, an Insured named EB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision. The police report further indicated that EB was not injured as a result of the accident. In keeping with the fact that EB was not injured, EB did not visit any hospital emergency department following the accident. To the extent that EB experienced any health issues as a result of the accident, they were low or minimal in severity at the outset, and improved over time. Even so, at the end of the purported initial examination on March 16, 2020, NJ Pain and Sheikh billed GEICO for the initial examination using CPT code 99244 and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(x)    On December 9, 2020, an Insured named AB was involved an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision and that AB's vehicle was drivable following the accident. The police report further indicated that AB was not injured as a result of the accident. In keeping with the fact that AB was not injured, AB did not visit any hospital emergency department following the accident. To the extent that AB experienced any health issues as a result of the accident, they were low or minimal in severity at the outset, and improved over time. Even so, at the end of the purported initial examination on February 21, 2021, NJ Pain and Sheikh billed GEICO for the initial examination using CPT code 99244 and therefore falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xi)    On March 12, 2021, an Insured named SY was involved in an automobile accident. The contemporaneous police report indicated that SY was not injured as a result of the accident. In keeping with the fact that SY was not seriously injured, SY did not visit any hospital emergency room following the accident. To the extent that SY experienced any health issues as a result of the accident, they were low or minimal in severity at the outset, and improved over time. Even so, at the end of the initial examination on May 6, 2021, NJ Pain and Sheikh billed GEICO for the initial examination using CPT code 99204 and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xii)    On May 9, 2022, an Insured named LM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision. The police report further indicated that LM was not injured as a result of the accident. In keeping with the fact that LM was not seriously

injured, LM did not visit any hospital emergency department following the accident. To the extent that LM experienced any health issues as a result of the accident, they were low or minimal in severity at the outset, and improved over time. Even so, at the end of the purported initial examination on August 15, 2022, NJ Pain and Sheikh billed GEICO for the initial examination using CPT code 99244 and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xiii)   On June 27, 2022, and Insured named ER was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision. To the extent that ER experienced any health issues as a result of the accident, they were low or minimal in severity at the outset, and improved over time. Even so, at the end of the purported initial examination on June 30, 2022, NJ Pain and Sheikh billed GEICO for an initial examination using CPT code 99204 and therefore falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xiv)   On August 13, 2022, an Insured named RC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision and that RC's vehicle was drivable following the accident. The police report further indicated that RC was not injured as a result of the accident. In keeping with the fact that RC was not injured, RC did not visit any hospital emergency department following the accident. To the extent that RC experienced any health issues as a result of the accident, they were low or minimal in severity at the outset, and improved over time. Even so, at the end of the purported initial examination on August 23, 2022, NJ Pain and Sheikh billed GEICO for the initial examination using CPT code 99244 and therefore falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xv)   On August 13, 2022, an Insured named MC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision and that MC's vehicle was drivable following the accident. The police report further indicated that MC was not injured as a result of the accident. In keeping with the fact that MC was not injured, MC did not visit any hospital emergency department following the accident. To the extent that MC experienced any health issues as a result of the accident, they were low or minimal in severity at the outset, and improved over time. Even so, at the end of the purported initial examination on August 24, 2022, NJ Pain and Sheikh billed GEICO for the initial examination using CPT code 99204 and therefore falsely represented that the initial examination involved presenting problems of moderate to high severity.

102.   These are only representative examples. In virtually all of the claims for initial examinations identified in Exhibit "1", NJ Pain and Sheikh falsely represented that the Insureds presented with problems of moderate to high severity when in fact the Insureds' problems were

low or minimal severity soft tissue injuries such as sprains and strains, to the extent that they had any presenting problems at all at the time of the examinations.

103.    In the claims for initial examinations identified in Exhibit "1", NJ Pain and Sheikh routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to create a false basis for their charges for examinations under CPT codes 99204 or 99244, because examinations billable under CPT codes 99204 and 99244 are reimbursable at higher rates than examinations involving presenting problems of low severity, minimal severity, or no severity.

104.    In the claims for initial examinations identified in Exhibit "1", NJ Pain and Sheikh also routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to create a false basis for the other Fraudulent Services the Defendants purported to provide to the Insureds, as described herein.

**2.    Misrepresentations Regarding the Amount of Time Spent on the Initial Examinations**

105.    What is more, in every claim identified in Exhibit "1" for initial evaluations under CPT codes 99204 and 99244, NJ Pain and Sheikh misrepresented and exaggerated the amount of face-to-face time that the examining physician spent with the Insureds or the Insureds' families during the purported examinations.

106.    Pursuant to the NY and NJ Fee Schedules, the use of CPT codes 99204 or 99244 to bill for an initial examination represents that the physician or other health care provider who performed the examination spent at least: (i) 45 minutes of face-to-face time with the patient or the patient's family when the examination was billed under CPT code 99204; and (ii) 60 minutes of face-to-face time with the patient or the patient's family when the examination was billed under CPT codes 99244.

107.    As set forth in Exhibit "1", NJ Pain and Sheikh submitted virtually all their billing for initial examinations under CPT codes 99204 and 99244, and thereby represented that the physicians who purported to perform the initial examination spent at least 45 minutes or 60 minutes of face-to-face time with the Insureds or the Insured's families when conducting the examinations.

108.    In fact, in the claims for initial examinations identified in Exhibit "1", the initial examinations did not entail more than 20 minutes of face-to-face time between the examining health care practitioner and the Insureds or their families, to the extent that the examinations actually were performed in the first instance.

109.    For instance, and in keeping with the fact that the initial examinations allegedly provided by Sheikh did not entail more than 20 minutes of face-to-face time with the Insureds or their families, the examinations consisted only of a check of some of the Insureds' vital signs, basic range of motion and muscle strength testing, and other limited examinations of the Insureds' musculoskeletal systems.

110.    These examinations did not require any physician or health care practitioner associated with NJ Pain to spend more than 20 minutes of face-to-face time with the Insureds during the putative initial examinations.

111.    In the claims for initial examinations identified in Exhibit "1", NJ Pain and Sheikh falsely represented that the putative examinations involved 45 minutes or 60 minutes of face-to-face time with the Insureds or their families, because examinations that entail 45 minutes or 60 minutes of face-to-face time with the patients or their families are reimbursable at higher rates than examinations that require less time to perform.

### 3.    Misrepresentations Regarding the Extent of Medical Decision-Making

112.    Pursuant to the NY and NJ Fee Schedules, the use of CPT code 99204 or 99244 to bill for a patient examination represents that the physician who performed the examination engaged in legitimate, "moderate complexity" medical decision-making.

113.    Pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

114.    As set forth above, pursuant to the CPT Assistant, the presenting problems that could require legitimate moderate complexity medical decision-making, and therefore support the use of CPT codes 99204 and 99244 to bill for an initial examination, typically are problems that pose a serious threat to the patient's health, or even the patient's life.

115.    By contrast, to the extent that the Insureds in the claims identified in Exhibit "1" had any presenting problems at all as the result of their accidents, the problems virtually always were minor soft tissue injuries such as sprains and strains.

116.    The diagnosis and treatment of these minor soft tissue injuries did not require any legitimate, moderate complexity medical decision-making.

117.    First, when the Insureds in the claims identified in Exhibit "1" presented to NJ Pain and Sheikh for "treatment", NJ Pain and Sheikh did not review any significant number of Insureds' preexisting medical records.

118.    Furthermore, prior to the initial examinations, NJ Pain and Sheikh did not request any medical records from any other providers.

119.    Second, NJ Pain and Sheikh's claims for initial examinations identified in Exhibit "1", there was no risk of significant complications or morbidity – much less mortality – from the Insureds' soft tissue injury complaints to the extent that they had any complaints arising from automobile accidents at all.

120.    Third, in NJ Pain and Sheikh's claims for initial examinations identified in Exhibit "1", NJ Pain and Sheikh did not consider any significant number of diagnoses or treatment options for the Insureds during the initial examinations.

121.    Specifically, in the substantial majority of claims identified in Exhibit "1", during the initial examinations the Insureds did not present with any significant continuing medical problems that legitimately could have been traced to an underlying automobile accident.

122.    Even so, NJ Pain and Sheikh prepared initial examination reports in which they provided a false series of spinal injury diagnoses.

123.    Based upon these false "diagnoses", NJ Pain and Sheikh directed Insured to continue with unsuccessful chiropractic treatment and often undergo medically unnecessary pain management injections.

124.    For example:

(i)    On August 4, 2018, an Insured named DM was in an automobile accident. The contemporaneous police report indicated that DM's vehicle was drivable following the accident. The police report further indicated that DM refused medical attention at the scene. In keeping with the fact that DM was not seriously injured, that DM did not visit any hospital emergency department following the accident. To the extent that DM experienced any health issues as a result of the accident, they were of low or minimal severity. On October 25, 2018, Sheikh purported to conduct an initial examination of DM at NJ Pain. Sheikh did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Sheikh provided DM with substantially the same false cervical and lumbar soft tissue

injury "diagnosis" that he provided to virtually every other Insured, and referred DM for medically unnecessary chiropractic treatment. NJ Pain and Sheikh billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Sheikh engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(ii)     On January 23, 2019, an Insured named IS was in an automobile accident. The contemporaneous police report indicated that IS's vehicle was drivable following the accident. The police report further indicated that IS was not injured as a result of the accident.  In keeping with the fact that IS was not seriously injured, IS did not visit any hospital emergency department following the accident. To the extent that IS experienced any health issues as a result of the accident, they were low or minimal severity. On July 25, 2019, Sheikh purported to conduct an initial examination of IS at NJ Pain. Sheikh did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Sheikh provided IS with substantially the same false cervical and lumbar soft tissue injury "diagnosis" that he provided to virtually every other Insured, and referred IS for medically unnecessary chiropractic treatment. NJ Pain and Sheikh billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented that Sheikh engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(iii)    On January 29, 2020, and Insured named SA was in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision and that SA's vehicle was drivable following the accident. The police report further indicated that SA was not injured as a result of the accident and that SA refused medical treatment. In keeping with the fact that SA was not injured, SA did not visit any hospital emergency department following the accident. To the extent that SA experienced any health issues as a result of the accident, they were of low or minimal severity. On October 5, 2020, Sheikh purported to conduct an initial examination of SA at NJ Pain. Sheikh did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Sheikh provided SA with substantially the same false cervical and lumbar soft tissue injury "diagnosis" that he provided to virtually every other Insured, and referred SA for medically unnecessary chiropractic treatment and medically unnecessary pain management injections. NJ Pain and Sheikh billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented that Sheikh engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(iv)    On July 2, 2020, an insured named JW was involved in an automobile accident. The contemporaneous police report indicated that JW's vehicle was drivable following the accident. The police report further indicated that JW was not injured in the accident and refused medical attention. In keeping with the fact that JW was not seriously injured, JW did not visit any hospital emergency department following the accident. What is more, JW's car suffered no visible damage as a result of the accident.  To the extent that JW experienced any health problems at all

as the result of the accident, they were of low or minimal severity. On October 1, 2020, Sheikh purported to conduct an initial examination of JW at NJ Pain. Sheikh did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Sheikh provided JW with substantially the same false cervical and lumbar soft tissue injury "diagnosis" that he provided to virtually every other Insured, and referred JW for medically unnecessary chiropractic treatment and medically unnecessary pain management injections. NJ Pain and Sheikh billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented that Sheikh engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(v)    On August 13, 2022, an Insured named MC was in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MC's vehicle was drivable following the accident. The police report further indicated that MC was not injured and did not complain of any pain at the scene of the accident. In keeping with the fact that MC was not seriously injured, MC did not visit any hospital emergency department following the accident. To the extent that MC experienced any health problems at all as the result of the accident, they were of low or minimal severity. On August 24, 2022, Sheikh purported to conduct an initial examination of MC at NJ Pain. Sheikh did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Sheikh provided MC with substantially the same false cervical and lumbar soft tissue injury "diagnosis" that he provided to virtually every other Insured, and referred MC for medically unnecessary chiropractic treatment and medically unnecessary pain management injections. NJ Pain and Sheikh billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Sheikh engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

125.    These are only representative examples. In virtually all of the claims for initial examinations identified in Exhibit "1", NJ Pain and Sheikh falsely represented that Sheikh engaged in some legitimate, moderate complexity medical decision-making during the purported examinations.

126.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

127.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

128.    It is extremely improbable that any two Insureds involved in any single accident would suffer substantially identical injuries as the result of their accidents or require a substantially identical course of treatment.

129.    It is even more improbable – to the point of impossibility – that this would occur repeatedly, often with the Insureds presenting at NJ Pain with substantially identical injuries on or about the exact same dates, days, weeks, or even months after their accidents.

130.    Even so, and in keeping with the fact that NJ Pain and Sheikh's putative "diagnoses" were phony, and in keeping with the fact that their putative initial examinations involved no actual medical decision-making at all, NJ Pain and Sheikh frequently issued substantially identical, false "diagnoses", on or about the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds, despite the fact that they were differently situated.

131.    For example:

(i)    On January 3, 2019, two Insureds – DC and DM – were involved in the same automobile accident. More than four months later, DC and DM presented – incredibly – on the same exact date, May 13, 2019, to NJ Pain for initial examinations. DC and DM were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that DC and DM suffered any injuries at all in their accident, the injuries were different. Even so, NJ Pain and Sheikh provided DC and DM with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary treatment for both of them.

(ii)    On June 5, 2019, two Insureds – CD and NS – were involved in the same automobile accident. More than a month later, CD and NS presented – incredibly – on the same exact date, July 16, 2019, to NJ Pain for initial examinations. CD and NS were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that CD and NS suffered any injuries at all in their accident, the injuries were different. Even so, NJ Pain and Sheikh provided CD and NS with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary treatment for both of them.

(iii)    On December 27, 2019, two Insureds – SB and MI – were involved in the same automobile accident. More than five months later, on May 28, 2020, SB presented to NJ Pain for an initial examination. Then, one day later, on May 29, 2020, MI too presented to NJ Pain for an initial examination. SB and MI were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that SB and MI suffered any injuries at all in their accident, the injuries were different. Even so, NJ Pain and Sheikh provided SB and MI with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary treatment for both of them.

(iv)    On October 6, 2020, two Insureds – JV and SV – were involved in the same automobile accident. Thereafter, JV and SV presented – incredibly – on the same exact date, October 14, 2020, to NJ Pain for initial examinations. JV and SV were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that JV and SV suffered any injuries at all in their accident, the injuries were different. Even so, NJ Pain and Sheikh provided JV and SV with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary treatment for both of them.

(v)    On October 17, 2020, two Insureds – AF and GF – were involved in the same automobile accident. Thereafter, AF and GF presented – incredibly – on the same exact date, October 28, 2020, to NJ Pain for initial examinations. AF and GF were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that AF and GF suffered any injuries at all in their accident, the injuries were different. Even so, NJ Pain and Sheikh provided AF and GF with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary treatment for both of them.

(vi)    On December 30, 2021, two Insureds – IA and SM – were involved in the same automobile accident. Thereafter, IA and SM presented – incredibly- on the same exact date, January 8, 2021, to NJ Pain for initial examinations. IA and SM were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that IA and SM suffered any injuries at all in their accident, the injuries were different. Even so, NJ Pain and Sheikh provided IA and SM with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary treatment for both of them.

(vii)    On February 27, 2021, two Insureds – RO and JO – were involved in the same automobile accident. More than four months later, on June 1, 2021, RO presented to NJ Pain for an initial examination. Then, weeks later, on June 29, 2021, JO too presented to NJ Pain for an initial examination. RO and JO were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that RO and JO suffered any injuries at all in their accident, the injuries were different. Even so, NJ Pain and Sheikh provided RO and JO with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary treatment for both of them.

(viii)   On March 12, 2021, two Insureds – NM and LM – were in the same automobile accident. More than one month later, on June 1, 2021, NM presented to NJ Pain fir an initial examination. Then, weeks later, on June 29, 2021, LM too presented to NJ Pain for an initial examination. NM and LM were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that NM and LM suffered any injuries at all in their accident, the injuries were different. Even so, NJ Pain and Sheikh provided NM and LM with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary treatment for both of them.

(ix)    On May 9, 2022, two Insureds – LM and NM – were involved in the same automobile accident. More than three months later, LM and NM presented – incredibly – on the same exact date, August 15, 2022, to NJ Pain for initial examinations. LM and NM were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that LM and NM suffered any injuries at all in their accident, the injuries were different. Even so, NJ Pain and Sheikh provided LM and NM with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary treatment for both of them.

(x)     On August 13, 2022, two Insureds – RC and MC – were involved in the automobile accident. Thereafter, on August 23, 2022, RC presented to NJ Pain for an initial examination. Then, one day later, on August 24, 2022, MC too presented to NJ Pain for an initial examination. RC and MC were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that RC and MC suffered any injuries at all in their accident, the injuries were different. Even so, NJ Pain and Sheikh provided RC and MC with substantially identical "diagnoses" and recommended a substantially identical course of medically unnecessary treatment for both of them.

132.   These are only representative examples. In the claims for initial examinations that are identified in Exhibit "1", NJ Pain and Sheikh frequently issued substantially identical "diagnoses", on or about the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds, despite the fact that the Insureds were differently situated and, in any case, did not require the treatment.

133.   NJ Pain and Sheikh routinely inserted these false "diagnoses" in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the other

Fraudulent Services that the Defendants and the Referring Providers purported to provide to the Insureds.

134.    In the claims for initial examinations identified in Exhibit "1", NJ Pain and Sheikh routinely falsely represented that the putative examinations involved medical decision making of low to moderate complexity in order to provide a false basis to bill for the initial examinations under CPT codes 99204 and 99244 because examinations billable under CPT codes 99204 and 99244 are reimbursable at a higher rate than examinations or examinations that do not require any complex medical decision-making at all.

**D.    The Fraudulent Charges for Follow-Up Examinations by NJ Pain and Sheikh**

135.    NJ Pain and Sheikh also typically purported to subject the Insureds in the claims identified in Exhibit "1" to fraudulent follow-up examinations during the course of the Defendants' fraudulent treatment and billing protocol.

136.    As set forth in Exhibit "1", Sheikh purported to perform the majority of the putative follow-up examinations on behalf of NJ Pain and billed GEICO using CPT codes 99213 and 99214, typically resulting in a charge of between $200 and $750.

137.    All of NJ Pain and Sheikh's billing for their purported follow-up examinations was fraudulent because it misrepresented NJ Pain and Sheikh's eligibility to collect PIP Benefits in the first instance.

138.    In fact, NJ Pain and Sheikh never were eligible to collect PIP Benefits in the claims for follow-up examinations that are identified in Exhibit "1", because they engaged in unlawful and fraudulent conduct as described herein.

139.    Moreover, and as set forth below, NJ Pain and Sheikh's charges for putative follow-up examinations identified in Exhibit "1" were fraudulent in that they misrepresented the nature, extent, and results of the purported examinations.

1.      **Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

140.    In the claims for follow-up examinations that are identified in Exhibit "1", NJ Pain and Sheikh routinely misrepresented the severity of the Insureds' presenting problems.

141.    Pursuant to the CPT Assistant, the use of CPT code 99214 to bill for a follow-up examination typically requires that the patient present with problems of moderate to high severity.

142.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT code 99214 to bill for a follow-up patient examination.

143.    For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99214 to bill for a follow-up patient examination:

(i)     Office visit for a 68-year-old male with stable angina, two months post myocardial infarction, who is not tolerating one of his medications. (Cardiology)

(ii)    Office evaluation of 28-year-old patient with regional enteritis, diarrhea and low-grade fever, established patient. (Family Medicine/Internal Medicine)

(iii)   Weekly office visit for 5FU therapy for an ambulatory established patient with metastatic colon cancer and increasing shortness of breath. (Hematology/Oncology)

(iv)    Office visit with 50-year-old female, established patient, diabetic, blood sugar controlled by diet. She now complains of frequency of urination and weight loss, blood sugar of 320 and negative ketones on dipstick. (Internal Medicine)

(v)     Follow-up visit for a 60-year-old male whose post-traumatic seizures have disappeared on medication, and who now raises the question of stopping the medication. (Neurology)

(vi)    Follow-up office visit for a 45-year-old patient with rheumatoid arthritis on gold, methotrexate, or immunosuppressive therapy. (Rheumatology)

(vii)   Office evaluation on new onset RLQ pain in a 32-year-old woman, established patient. (Urology/General Surgery/ Internal Medicine/Family Medicine)

(viii)   Office visit with 63-year-old female, established patient, with familial polyposis, after a previous colectomy and sphincter sparing procedure, now with tenesmus, mucus, and increased stool frequency. (Colon and Rectal Surgery)

144.   Accordingly, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT codes 99214 to bill for a follow-up patient examination typically are problems that pose a serious threat to a patient's health, or even the patient's life.

145.   Similarly, pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up examination typically requires that the patient present with problems of low to moderate severity.

146.   The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as problems of low to moderate severity, and thereby justify the use of CPT code 99213 to bill for a follow-up patient examination.

147.   For example, the CPT Assistant provides the following clinical examples of presenting problems that might qualify as problems of low to moderate severity, and therefore support the use of CPT code 99213 to bill for a follow-up patient examination:

(i)   Follow-up visit with 55-year-old male for management of hypertension, mild fatigue, on beta blocker/thiazide regimen. (Family Medicine/Internal Medicine)

(ii)   Follow-up office visit for an established patient with stable cirrhosis of the liver. (Gastroenterology)

(iii)   Outpatient visit with 37-year-old male, established patient, who is 3 years post total colectomy for chronic ulcerative colitis, presents for increased irritation at his stoma. (General Surgery)

(iv)   Routine, follow-up office evaluation at a three-month interval for a 77-year-old female with nodular small cleaved-cell lymphoma. (Hematology/Oncology)

(v)   Follow-up visit for a 70-year-old diabetic hypertensive patient with recent change in insulin requirement. (Internal Medicine/Nephrology)

(vi)     Quarterly follow-up office visit for a 45-year-old male, with stable chronic asthma, on steroid and bronchodilator therapy. (Pulmonary Medicine)

(vii)    Office visit with 80-year-old female established patient, for follow-up osteoporosis, status-post compression fractures. (Rheumatology)

148.    Accordingly, even the low to moderate severity presenting problems that would support a charge under CPT code 99213 typically are chronic and relatively severe problems that pose some real, ongoing threat to the patient's health.

149.    By contrast, and as set forth above, to the extent that the Insureds in the claims identified in Exhibit "1" suffered any injuries at all in their automobile accidents, the injuries virtually always were soft tissue injuries such as sprains and strains, which were of low or minimal severity at the outset and improved over time.

150.    By the time the Insureds in the claims identified in Exhibit "1" presented to NJ Pain for the putative follow-up examinations, the Insureds either did not have any genuine presenting problems at all as the result of their automobile accidents, or their presenting problems were minimal.

151.    Even so, in the claims for follow-up examinations identified in Exhibit "1", NJ Pain and Sheikh routinely billed for their putative follow-up examinations under CPT codes 99213 or 99214, and thereby falsely represented that the Insureds continued to suffer from presenting problems of low to moderate severity or moderate to high severity, despite the fact that the purported examinations were provided many months after the Insureds' automobile accidents, and long after any soft tissue injury pain or other symptoms attendant to the automobile accidents would have resolved.

152.    For example:

(i)     On September 14, 2016, an Insured named TE was involved in an automobile accident. The contemporaneous police report indicated that TE's vehicle was drivable following the accident. The police report further indicated that TE was not

injured as a result of the accident and refused medical treatment. In keeping with the fact that TE was not seriously injured, TE did not visit any hospital emergency department following the accident. To the extent that TE experienced any health problems as a result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of TE on October 24, 2019 – over three years after the accident – NJ Pain and Sheikh billed for the follow-up examination using CPT code 99214, and thereby falsely represented that TE presented with problems of moderate to high severity.

(ii)    On October 23, 2017, an Insured named SH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that SH's vehicle was drivable following the accident. In keeping with the fact that SH was not seriously injured, when SH presented the next day, October 24, 2017, to St. Mary's General Hospital, she was briefly observed on an outpatient basis and released shortly thereafter with diagnosis of an acute sprain of ligament of neck and acute lumbar back pain. To the extent that SH experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of SH on December 3, 2018 – more than one year later – NJ Pain and Sheikh billed for the follow-up examination using CPT code 99214, and thereby falsely represented that SH presented with problems of moderate to high severity.

(iii)    On April 27, 2020, an Insured named HA was in an automobile accident. The contemporaneous police report indicated that HA's vehicle was drivable following the accident. The police report further indicated that HA was not injured as a result of the accident and refused medical treatment. In keeping with the fact that HA was not seriously injured, HA did not visit any hospital emergency department following the accident. To the extent that HA experienced any health problems at all as a result of the accident, they were low or minimal in severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of HA on August 5, 2022 – over two years after the accident – NJ Pain and Sheikh billed for the follow-up examination using CPT code 99214, and thereby falsely represented that HA presented with problems of moderate to high severity.

(iv)    On July 2, 2020, an insured named JW was involved in an automobile accident. The contemporaneous police report indicated that JW's vehicle was drivable following the accident. The police report further indicated that JW was not injured in the accident and refused medical attention. In keeping with the fact that JW was not seriously injured, JW did not visit any hospital emergency department following the accident. What is more, JW's car suffered no visible damage as a result of the accident. To the extent that JW's experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset and had completely resolved within two to three months of the accident. Even so, following

a purported follow up examination of JW on January 7, 2021 – six months after the accident – NJ Pain and Sheikh billed for the follow-up examination using CPT code 99214, and thereby falsely represented that JW presented with problems of moderate to high severity.

(v)    On July 25, 2020, an Insured named JA was in volved in an automobile accident. The contemporaneous police report indicated that JA's vehicle was drivable following the accident. The police report further indicated that JA was not injured in the accident and refused medical attention. In keeping with the fact that JA was not seriously injured, when JA presented later that same day to Hackensack University Medical Center, he was briefly observed on an outpatient basis and released shortly thereafter with a diagnosis of neck pain and low back pain as a result of the automobile accident. To the extent that JA experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of JA on August 4, 2022 – over two years after the accident - NJ Pain and Sheikh billed for the follow-up examination using CPT code 99214, and thereby falsely represented that JA presented with problems of moderate to high severity.

(vi)    On October 6, 2020, an Insured named SV was in an automobile accident. To the extent that SV experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of SV on December 9, 2021 – more than one year after the accident - NJ Pain and Sheikh billed for the follow-up examination using CPT code 99214, and thereby falsely represented that SV presented with problems of moderate to high severity.

(vii)   On or about March 12, 2021, an Insured named SY was in an automobile accident. The contemporaneous police report indicated that SY was not injured as a result of the accident. In keeping with the fact that SY was not seriously injured, SY did not visit any hospital emergency department following the accident. To the extent that SY experienced any health issues as a result of the accident, they were low or minimal in severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of SY on May 26, 2022 – over one year after the accident – NJ Pain and Sheikh billed for the follow-up examination using CPT code 99214, and thereby falsely represented that SY presented with problems of moderate to high severity.

(viii)  On May 5, 2022, an Insured named MM was in an automobile accident. Following the accident, MM was briefly observed on an outpatient basis at St. Joseph's Wayne Medical Center and released shortly thereafter with a cervical strain diagnosis. To the extent that MM experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of MM on January 25, 2023 – over eight months after the

accident – NJ Pain and Sheikh billed for the follow-up examination using CPT code 99214, and thereby falsely represented that MM presented with problems of moderate to high severity.

(ix)  On August 13, 2022, an Insured named RC was in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision and that RC's vehicle was drivable following the accident. The police report further indicated that RC was not injured as a result of the accident. In keeping with the fact that RC was not injured, RC did not visit any hospital emergency department following the accident. To the extent that RC experienced any health issues as a result of the accident, they were low or minimal in severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of RC on February 8, 2023 – almost six months after the accident – NJ Pain and Sheikh billed for the follow-up examination using CPT code 99214, and thereby falsely represented that RC presented with problems of moderate to high severity.

(x)  On August 13, 2022, an Insured named MC was in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision and that MC's vehicle was drivable following the accident. The police report further indicated that MC was not injured as a result of the accident. In keeping with the fact that MC was not injured, MC did not visit any hospital emergency department following the accident. To the extent that MC experienced any health issues as a result of the accident, they were low or minimal in severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of MC on February 8, 2023 – almost six months after the accident – NJ Pain and Sheikh billed for the follow-up examination using CPT code 99214, and thereby falsely represented that MC presented with problems of moderate to high severity.

153.  These are only representative examples. In virtually all of the claims for follow-up examinations identified in Exhibit "1", NJ Pain and Sheikh falsely represented that Insureds presented with problems of low to moderate or moderate to high severity, when in fact the Insured either did not have any genuine presenting problems at all as the result of their automobile accidents at the time of the follow-up examinations – which often were many months after the accidents – or else their presenting problems were minimal.

154.  In the claims for follow-up examinations identified in Exhibit "1", NJ Pain and Sheikh routinely falsely represented that the Insureds presented with problems of low to moderate or moderate to high severity in order to create a false basis for their charges for the putative

examinations under CPT codes 99213 and/or 99214, because examinations billable under CPT codes 99213 and 99214 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity.

**2.      Misrepresentations Regarding the Results of the Follow-Up Examinations**

155.    Moreover, pursuant to the NY and NJ Fee Schedule, when NJ Pain and Sheikh submitted charges for the follow-up examinations under CPT code 99214, they represented that they performed at least two of the following three components: (i) took a "detailed" patient history; (ii) conducted a "detailed" physical examination; and (iii) engaged in medical decision-making of "moderate complexity".

156.    Along similar lines, pursuant to the NY and NJ Fee Schedule, when NJ Pain and Sheikh submitted charges for the follow-up examinations under CPT code 99213, they represented that they performed at least two of the following three components performed at least two of the following three components: (i) took an "expanded problem focused" patient history; (ii) conducted an "expanded problem focused physical examination"; and (iii) engaged in medical decision-making of "low complexity".

157.    In actuality, however, in the claims for follow-up examinations identified in Exhibit "1", NJ Pain and Sheikh did not take any legitimate patient histories, conduct any legitimate physical examinations, or engage in any legitimate medical decision-making at all.

158.    Rather, following their purported follow-up examinations, NJ Pain and Sheikh simply reiterated the false, boilerplate "diagnoses" from the Insureds' initial examinations and recommended that the Insureds receive medically unnecessary chiropractic treatment and medically unnecessary pain management injections.

159. In keeping with the fact that the putative "results" of the follow-up examinations were phony, NJ Pain and Sheikh routinely falsely purported to diagnoses continuing effects of soft tissue injuries in the Insureds long after the underlying automobile accidents occurred, and long after any attendant soft tissue injury pain of the symptoms attendant to the automobile accidents would have resolved.

160. For example:

(i)    On November 21, 2018, an Insured named HA was in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that HA's vehicle was drivable following the accident. The police reported further indicated that HA was not injured and did not complain of any pain at the scene of the accident. In keeping with the fact that HA was not seriously injured, HA did not present to any hospital emergency department immediately following the accident. To the extent that HA experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two of three months of the accident. Even so, following a purported follow up examination of HA on January 23, 2020 – over one year after the accident – NJ Pain and Sheikh falsely reported that HA continued to suffer from high levels of pain as the result of the accident, and recommended that HA undergo additional chiropractic treatment.

(ii)   On March 4, 2020, an Insured named NS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that NS's vehicle was drivable following the accident. The police reported further indicated that NS was not injured and refused medical attention at the scene of the accident. In keeping with the fact that NS was not seriously injured, NS did not present to any hospital emergency department immediately following the accident. To the extent that NS experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two of three months of the accident. Even so, following a purported follow up examination of NS on August 5, 2022 – seventeen months after the accident – NJ Pain and Sheikh falsely reported that NS continued to suffer from high levels of pain as the result of the accident, and recommended that NS undergo additional chiropractic treatment.

(iii)  On December 9, 2020, an Insured named AB was in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision and that AB's vehicle was drivable following the accident. The police report further indicated that AB was not injured as a result of the accident. In keeping with the fact that AB was not injured, AB did not visit any hospital emergency department following the accident. To the extent that AB experienced any health issues as a result of the accident, they were low or minimal in severity

at the outset, and had completely resolved within two of three months of the accident. Even so, following a purported follow up examination of AB on April 4, 2022 - over a year after the accident – NJ Pain and Sheikh falsely reported that AB continued to suffer from high levels of pain as the result of the accident, and recommended that AB undergo additional chiropractic treatment.

(iv)    On November 14, 2021, an Insured named DD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision. The police reported further indicated that DD was not injured and did not complain of any pain at the scene of the accident. In keeping with the fact that DD was not seriously injured, DD did not present to any hospital emergency department immediately following the accident. To the extent that DD experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two of three months of the accident. Even so, following a purported follow up examination of DD on October 25, 2022 – eleven months after the accident – NJ Pain and Sheikh falsely reported that DD continued to suffer from high levels of pain as the result of the accident, and recommended that DD undergo additional chiropractic treatment and pain management injections.

(v)    On August 13, 2022, an Insured named RC was in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision and that RC's vehicle was drivable following the accident. The police report further indicated that RC was not injured as a result of the accident. In keeping with the fact that RC was not injured, RC did not visit any hospital emergency department following the accident. To the extent that RC experienced any health issues as a result of the accident, they were low or minimal in severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of RC on February 8, 2023 – almost six months after the accident – NJ Pain and Sheikh falsely reported that RC continued to suffer from high levels of pain as the result of the accident, and recommended that RC undergo additional chiropractic treatment and pain management injections.

161.    These are only representative examples. In the claims for follow-up examinations identified in Exhibit "1", NJ Pain and Sheikh routinely falsely represented that the Insureds continued to suffer from pain and other symptoms as the result of their automobile accidents, often long after the accidents occurred.

162.    In the claims for follow-up examinations identified in Exhibit "1", NJ Pain and Sheikh routinely falsely represented that the Insureds continued to suffer pain and other symptoms as the result of minor soft tissue injuries, long after the underlying accidents occurred, because

49

these phony diagnoses provided a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

**E.      Defendants' Medically Unnecessary Pain Injections**

163.    As part and parcel of the Defendants' fraudulent scheme, NJ Pain and Sheikh caused many of the Insureds in the claims identified in Exhibit "1" to be subjected to a series of medically unnecessary pain management injections including, but not limited to, epidural injections, nerve block injections, facet injections, and trigger point injections, which often purportedly were performed with fluoroscopic guidance under anesthesia.

164.    As set forth below, the pain management injections were medically unnecessary and were provided – to the extent that they were provided at all – pursuant to the Defendants' pre-determined fraudulent treatment and billing protocol, and not to treat or otherwise benefit the Insureds who were subjected to them.

**1.      Basic, Legitimate Use of Pain Management Injections**

165.    Generally, when a patient presents with a soft tissue injury such as a sprain or strain secondary to an automobile accident, the initial standard of care is conservative treatment comprised of rest, ice, compression, and – if applicable – elevation of the affected body part.

166.    If that sort of conservative treatment does not resolve the patient's symptoms, the standard of care can include other conservative treatment modalities such as chiropractic treatment, physical therapy, and the use of pain management medication.

167.    The substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of weeks through this sort of conservative treatment, or no treatment at all.

168.    In a legitimate clinical setting, pain management injections should not be administered until a patient has failed more conservative treatments, including chiropractic treatment, physical therapy, and pain management medication.

169.    This is because the substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of weeks through conservative treatment, or no treatment at all, and invasive interventional pain management procedures entail a degree of risk to the patient that is absent in conservative forms of treatment.

170.    In a legitimate clinical setting, pain management injections should not be administered more than once every two months, and multiple varieties of pain management injections should not be administered simultaneously.

171.    This is because: (i) properly administered pain management injections should provide pain relief lasting for at least two months; (ii) a proper interval between pain management injections, and different types of pain management injections, is necessary to determine whether or not the initial pain management injections were effective; and (iii) if a patient's pain is not relieved through the pain management injections, the pain may be caused by something more serious than a soft tissue injury secondary to an automobile accident, and the perpetuating factors of the pain must be identified and managed.

**2.    The Defendants' Medically Unnecessary Pain Management Injections**

172.    As set forth above, virtually all of the Insureds in the claims identified in Exhibit "1", were involved in relatively minor accidents.

173.    To the limited extent that the Insureds in the claims identified Exhibit "1" experienced any injuries at all in their relatively minor accidents, the injuries virtually always were minor soft tissue injuries such as sprains and strains.

174.    By the time the Insureds in the claims identified in Exhibit "1" presented to NJ Pain and Sheikh for treatment, they either had no presenting problems at all or their presenting problems

consisted of minor sprains and strains that were in the process of being resolved through conservative treatment, or without any treatment at all.

175.    Even so, in the claims for pain management injections identified in Exhibit "1", NJ Pain and Sheikh routinely provided pain management injections to Insureds who did not have any serious symptoms secondary to any automobile accident that legitimately would warrant the injections and frequently administered provision of multiple pain management injections to Insureds within a short period, each time constituting a serious deviation from the standard of care.

176.    For example:

(i)    On June 5, 2018, an Insured named MI was involved in an automobile accident. MI did not visit any hospital emergency department following the incident. To the extent that MI experienced any health problems at all as a result of the accident, they were low or minimal in severity at the outset, and improved over time. Even so, NJ Pain and Sheikh purported to provide three nerve block injections and two trigger point injections on or about November 20, 2018. These procedures were purportedly provided to MI over five months after the accident, long after any legitimate symptoms MI may have experienced as a result of the accident had resolved.

(ii)    On February 14, 2020, an insured named MN was involved in an automobile accident. The contemporaneous police report indicated that MN complained of chest and head pain after the accident and was subsequently transported via ambulance to Christ Hospital. Hospital records indicate that MN was briefly observed on an outpatient basis, and then was discharged with nothing more serious than minor soft tissue injury diagnoses. To the extent that MN experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset and had completely resolved within two to three months of the accident. Even so, NJ Pain and Sheikh purported to provide a medically unnecessary nerve block injection and lumbar epidural injection on May 8, 2021, more than fifteen months after the accident. These injections were purportedly provided to MN fifteen months after the accident and long after any legitimate symptoms MN may have experienced as a result of the accident had resolved.

(iii)    On April 27, 2020, an Insured named HA was involved in an automobile accident. The contemporaneous police report indicated that HA's vehicle was drivable following the accident. The police report further indicated that HA was not injured as a result of the accident and refused medical treatment. In keeping with the fact that HA was not seriously injured, HA did not visit any hospital emergency department following the accident. To the extent that HA experienced any health problems at all as a result of the accident, they were low or minimal in severity at the outset, and improved over time. Even so, NJ Pain and Sheikh purported to provide almost eight

months of pain management treatment for HA, commencing nearly two years after the accident. NJ Pain and Sheikh purported to provide over fifteen medically unnecessary injections including various nerve blocks and trigger point injections. These procedures were purportedly provided to HA between twenty-one and twenty-six months after the accident and long after any legitimate symptoms HA may have experienced as a result of the accident had resolved.

(iv)     On July 2, 2020, an insured named JW was involved in an automobile accident. The contemporaneous police report indicated that JW's vehicle was drivable following the accident. The police report further indicated that JW was not injured in the accident and refused medical attention. In keeping with the fact that JW was not seriously injured, JW did not visit any hospital emergency department following the accident. What is more, JW's car suffered no visible damage as a result of the accident. To the extent that JW experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset and had completely resolved within two to three months of the accident. Even so, JW was referred to NJ Pain where NJ Pain and Sheikh purported to provide JW with one medically unnecessary transforaminal epidural injection under on October 20, 2020 – more than three months after the accident. What is more, NJ Pain and Sheikh purported to provide JW with a nerve block injection, a lumbar epidural injection and a trigger point injection at an ambulatory surgery center on December 19, 2020. These procedures were purportedly provided to JW between three and five after the accident and after any legitimate symptoms JW may have experienced as a result of the accident had resolved.

(v)     On or about March 12, 2021, an Insured named SY was involved in an automobile accident. The contemporaneous police report indicated that SY was not injured as a result of the accident. In keeping with the fact that SY was not seriously injured, SY did not visit any hospital emergency department following the accident. To the extent that SY experienced any health issues as a result of the accident, they were low or minimal in severity at the outset, and improved over time. Even so, NJ Pain and Sheikh purported to provide SY with various medically unnecessary nerve block injections with CPT codes 64450, 64405 and 64418 starting May 20, 2021, and concluding on May 26, 2022. These procedures were purportedly provided to SY between two and fourteen months after the accident, and long after any legitimate symptoms SY may have experienced as a result of the accident had resolved.

(vi)     On or about November 24, 2021, an Insured named GC was involved in an automobile accident. On December 17, 2021, NJ Pain and Sheikh purported to provide a nerve block injection to GC. Three months later, on March 11, 2022, NJ Pain and Sheikh purported to provide one joint injection, one nerve block injection and one trigger point injection to GC. Five days thereafter, on March 16, 2022, NJ Pain and Sheikh purported to provide another nerve block injection, a steroid injection and two lumbar epidural injections. Less than a month later, on April 8, 2022, NJ Pain and Sheikh purported to provide GC with three nerve block injections, another steroid injection, a joint injection, and another trigger point injection. Less than 2 months later, on May 13, 2022, NJ Pain and Sheikh purported to provide GC

with another joint injection, three more nerve block injections, another steroid injection and another trigger point injection. Less than a month thereafter, on June 10, 2022, NJ Pain and Sheikh purported to provide GC with three more nerve block injections and another trigger point injection. Less than two months thereafter, on August 5, 2022, NJ Pain and Sheikh purported to provide three more nerve block injections, another steroid injection and a trigger point injection to GC. Less than a month thereafter, on September 2, 2022, NJ Pain and Sheikh purported to provide a joint injection, three more nerve block injections, another steroid injection and a trigger point injection to GC. Less than two months thereafter, on October 7, 2022, NJ Pain and Sheikh purported to provide another nerve block injection and another trigger point injection to GC. Less than two months thereafter, on December 2, 2022, NJ Pain and Sheikh purported to provide an epidural injection, another nerve block injection and a trigger point injection. Less than a month later, on December 30, 2022, NJ Pain and Sheikh purported to provide another nerve block injections and another trigger point injection to GC. What is more, less than a month later, on January 27, 2023, NJ Pain and Sheikh purported to provide GC with another nerve block injections and another trigger point injection. NJ Pain and Sheikh purportedly administered at least nine rounds of pain management injections within a twelve-month period. The repeated provision of multiple pain management injections to GC within a short period constituted a serious deviation from the standard of care.

(vii) On January 26, 2022, an Insured named YA was involved in an automobile accident. Two weeks after the accident, on February 10, 2022, NJ Pain and Sheikh purported to provide five nerve block injections and one trigger point injection. Just two weeks thereafter, on February 24, 2022, NJ Pain and Sheikh purported to provide the Insured with four additional nerve block injections. Two weeks later, on March 10, 2022, NJ Pain and Sheikh purported to provide three more nerve block injections and one more trigger point injection. Three weeks later, on March 31, 2020, NJ Pain and Sheikh purported to provide YA with another six nerve block injections and two additional trigger point injections. Six weeks thereafter, on May 14, 2022, NJ Pain and Sheikh purported to provide YA with four lumbar epidural injections, two trigger point injections, one nerve block injection and one steroid injection. Four months thereafter, on July 14, 2022, NJ Pain and Sheikh purported to provide YA with one nerve block injection and one trigger point injection. Less than ten days later, on July 23, 2022, NJ Pain and Sheikh purported to provide YA with one nerve block injection, one trigger point injection, one steroid injection and two lumbar epidural injections. Less than three weeks thereafter, on August 11, 2022, NJ Pain and Sheikh purported to provide one trigger point injection to YA. NJ Pain and Sheikh purportedly administered at least eight round of pain management injections to YA within a six-month period. The repeated provision of multiple pain management injections to YA within a short period constituted a serious deviation from the standard of care.

(viii) On May 5, 2022, an Insured named MM was involved in an automobile accident. On September 20, 2022, NJ Pain and Sheikh purported to provide the Insured with three nerve block injections and a trigger point injection. Less than a month thereafter, on October 1, 2022, NJ Pain and Sheikh purported to provide an additional nerve block,

another trigger point injection and two lumbar epidural injections. Less than three weeks thereafter, on October 17, 2022, NJ Pain and Sheikh purported to provide MM with three additional nerve blocks and another trigger point injection. Six weeks later, on November 28, 2022, NJ Pain and Sheikh purported to provide the Insured with an additional three nerve block injections, another trigger point injection, and a further pain management injection. Five days later, on December 3, 2022, NJ Pain and Sheikh purported to provide MM with two more nerve block injections, a lumbar epidural injection, a trigger point injection, a joint pain injection, and another further pain management injection. Less than two months thereafter, on January 25, 2023, NJ Pain and Sheikh purported to provide three more nerve block injections, and a trigger point injection. Less than three weeks thereafter, on February 11, 2023, NJ Pain and Sheikh purported to provide two lumbar epidural injections, another nerve block injection, a trigger point injection, and two additional pain management injections. NJ Pain and Sheikh purportedly administered at least seven rounds of pain management injections within a five-month period, often with multiple injections per round. The repeated provision of multiple pain management injections to MM within a short period constituted a serious deviation from the standard of care.

(ix)     On June 27, 2022, an Insured named ER was involved in an automobile accident. Three days after the accident, on June 30, 2022, long before ER could have failed any conservative treatment, NJ Pain and Sheikh purported to provide ER with three nerve block injections, and a trigger point injection. Two weeks thereafter, on July 14, 2022, NJ Pain and Sheikh purported to provide an additional nerve block and trigger point injection to ER. Two weeks thereafter, on July 30, 2022, NJ Pain and Sheikh purported to provide ER with another nerve block injection, another trigger point injection, two lumbar epidural injections, and a steroid injection. Less than two weeks thereafter, on August 11, 2022, NJ Pain and Sheikh purported to provide ER with three more nerve block injections and a trigger point injection. Two weeks thereafter, on August 27, 2022, NJ Pain and Sheikh purported to provide ER with an additional nerve block injection, another steroid injection, a trigger point injection, and two lumbar epidural injections. Less than three weeks thereafter, on September 15, 2022, NJ Pain and Sheikh purported to provide ER with provide an additional nerve block and another trigger point injection. Two weeks thereafter, on September 29, 2022, NJ Pain and Sheikh purported to provide yet another additional nerve block and trigger point injection to ER. Three weeks thereafter, on October 20, 2022, NJ Pain and Sheikh purported to provide ER with three nerve block injections and a trigger point injection. Two weeks thereafter, on November 3, 2022, NJ Pain and Sheikh purported to provide ER with an additional nerve block and another trigger point injection. Another two weeks thereafter, on November 17, 2022, NJ Pain and Sheikh purported to provide ER with an additional nerve block and another trigger point injection. Less than three weeks later, on December 3, 2022, NJ Pain and Sheikh purported to provide ER with a nerve block injection, a lumbar epidural injection, a trigger point injection, and two joint pain management injections. Less than two weeks thereafter, on December 15, 2022, NJ Pain and Sheikh purported to provide another nerve block and trigger point injection to ER. NJ Pain and Sheikh purportedly administered at least twelve-rounds of pain management injections to ER within a six-month period, typically featuring multiple injections per round. The

repeated provision of multiple pain management injections to ER within a short period constituted a serious deviation from the standard of care.

(x)    On January 8, 2023, an Insured named JF was involved in an automobile accident. JF did not visit any hospital emergency department following the accident. To the extent that JF experienced any health issues as a result of the accident, they low or minimal in severity at the outset, and improved over time. Even so, NJ Pain and Sheikh purported to provide JF with three nerve block injections and a trigger point injection on January 25, 2023. These procedures were purportedly provided to JF less than one month after the accident, long before JF could have failed a legitimate course of conservative treatment.

177.    These are only representative examples. In the claims identified in Exhibits Exhibit "1", NJ Pain and Sheikh – on numerous occasions – caused multiple Insureds to be subjected to a series of medically unnecessary pain management injections.

**F.    Sheikh's Unlawful Self-Referrals to NJ Pain and Global Surgery Center**

178.    Not only did NJ Pain and Sheikh fraudulently submit charges for medically unnecessary pain management injections, but – in connection with the injections – they also engaged in illegal self-referrals between and among Sheikh, NJ Pain, and an ambulatory care facility called Global Surgery Center LLC ("Global Surgery").

179.    As an ambulatory surgery center, Global Surgery provided surgical facility space to physicians and other health care providers, and generated revenue by charging facility fees to GEICO and other automobile insurers in connection with the surgical procedures it hosted.

180.    As a result, Global Surgery's business depended on patient referrals from physicians and other health care providers. Unless physicians and other health care providers scheduled surgical procedures at Global Surgery, Global Surgery would be unable to generate revenue from facility fees.

181.    In order to incentivize physicians and other health care providers to schedule surgical procedures at Global Surgery, Global Surgery granted purported fractional "ownership"

interests in Global Surgery to physicians and other health care providers who agreed to schedule surgical procedures at Global Surgery.

182.    The amount of each putative "ownership" interest granted to the physicians and other health care providers who agreed to schedule surgical procedures at Global Surgery was not based on the relative financial investments that the physicians and other health care providers made in Global Surgery. Rather, the amount of each putative "ownership" interest in Global Surgery granted to the physicians and other health care providers depended on the volume of surgical procedures that they scheduled at Global Surgery.

183.    In fact, these purported "ownership" interests were not real ownership interests at all. Rather, they were disguised unlawful compensation in exchange for patient referrals to Global Surgery.

184.    In keeping with the fact that these purported "ownership" interests in Global Surgery were not real ownership interests at all, Global Surgery regularly readjusted the amount of each fractional "ownership" interest in Global Surgery based on the volume of surgical procedures that each physician or health care provider scheduled at Global Surgery.

185.    According to Global Surgery's licensing records, Sheikh had a 3-4% ownership interest in Global Surgery beginning in or about 2018.

186.    As set forth above, the Codey Law provides – in substance – that a "practitioner" may not refer a patient to a "health care service" in which the practitioner has a "significant beneficial interest". See N.J.S.A. 45:9-22.5.

187.    However – and again, as set forth above – the Codey Law's restrictions on patient referrals do not apply to:

medical treatment or a procedure that is provided at the practitioner's medical office and for which a bill is issued directly in the name of the practitioner or the practitioner's medical office ….

See id.

188.    What is more, pursuant to the ASC Exception described above, the Codey Law's restrictions on patient referrals also do not apply to "ambulatory surgery or procedures involving the use of anesthesia performed at … an ambulatory care facility licensed by the Department of Health to perform surgical and related services", provided that – among other things – the practitioner who provided the referral "personally performs the procedure". See id.

189.    In the context of the Codey Law, Sheikh – who is a licensed physician – was a "practitioner []". See N.J.S.A. 45:9-22.4.

190.    In the context of the Codey Law, NJ Pain and Global Surgery were "health care services", in that they were "business entit[ies] which provide[d] on an inpatient or outpatient basis: … diagnosis or treatment of human disease or dysfunction …." Id.

191.    In the context of the Codey Law, Sheikh – who owned NJ Pain and purported to be an owner of Global Surgery – had a "significant beneficial interest" in NJ Pain and Global Surgery. Id.

192.    In the context of the Codey Law, Global Surgery was an "ambulatory care facility licensed by the Department of Health to perform surgical and related services".

193.    Notwithstanding his respective significant beneficial/ownership interests in NJ Pain and Global Surgery, Sheikh routinely self-referred – or directed his employees to self-refer – Insureds to NJ Pain and Global Surgery for medically unnecessary pain management injections, which purportedly were performed at Global surgery.

194.    These self-referrals violated the Codey Law, inasmuch as none of the exceptions to the Codey Law applied to these self-referrals.

195.    The exception in the Codey Law, for "medical treatment or a procedure that is provided at the practitioner's medical office", did not apply to the self-referrals for these injections because – as set forth above – virtually all of the pain management injections billed through NJ Pain in the claims identified in Exhibit "1" purportedly were provided at Global Surgery Center at 680 Kinderkamack Road, Oradell, New Jersey, which is not Sheikh's or NJ Pain's medical office.

196.    Nor did the ASC Exception apply to these self-referrals, because the pain management injections did not legitimately qualify as ambulatory surgery or procedures requiring or involving the use of anesthesia. To the contrary, all of the anesthesia services attendant to NJ Pain's pain management injections -- i.e., sedation -- were medically unnecessary.

197.    In a legitimate clinical setting, pain management injections such as epidural injections and facet joint injections generally do not require anesthesia.

198.    Indeed, according to a review of the literature published in Pain Physician, the official journal of the American Society of Interventional Pain Physicians, "[m]ost practice guidelines discourage the routine use of sedation for interventional pain procedures." See Smith, Howard, M.D., Evaluation of Intravenous Sedation on Diagnostic Spinal Injection Procedures, Pain Physician 2013.

199.    Along similar lines, the American Society of Anesthesiologists has specified that "the majority of minor pain procedures, under most routine circumstances, do not require anesthesia care other than local anesthesia. Such procedures include epidural steroid injections, epidural blood patch, trigger point injections, sacroiliac joint injections, bursal injections, and occipital nerve block and facet joint injections." See American Society of Anesthesiologists,

"Statement on Anesthetic Care during Interventional Pain Procedures for Adults", October 20, 2010.

200.    Sedation generally is unwarranted in the context of interventional pain procedures such as pain management injections because the risk attendant to sedation outweighs any prospective benefit to the patient.

201.    Not only can sedation itself induce adverse events, including death, but patients receiving pain management injections should remain awake and alert to warn the treating physician of adverse events relating to the underlying injections.

202.    Nonetheless, Sheikh routinely referred GEICO Insureds to NJ Pain and Global Surgery Center to receive pain management injections.

203.    For example:

(i)    On December 9, 2020, Sheikh purported to conduct a follow-up examination of an Insured named JV at NJ Pain. Billing for JV's examination was submitted to GEICO through NJ Pain. At the conclusion of JV's examination, Sheikh self-referred JV to NJ Pain and Global Surgery for multiple injections that all did not legitimately qualify as "ambulatory surgery or procedures involving the use of anesthesia". The injections were performed by Sheikh on December 19, 2020, at Global Surgery, rather than at Sheikh's or NJ Pain's office. The self-referral violated the Codey Law because (a) the resulting injections did not qualify as "ambulatory surgery or procedures involving the use of anesthesia"; and (b) the injections were performed at Global Surgery, rather than at Sheikh's or NJ Pain's medical office. Even so, Sheikh and Global Surgery billed GEICO for the injections, which were the product of an unlawful self–referral.

(ii)    On December 10, 2020, Sheikh purported to conduct a follow-up examination of an insured named JW at NJ Pain. Billing for JW's examination was submitted to GEICO through NJ Pain. At the conclusion of JW's examination, Sheikh self-referred JW to NJ Pain and Global Surgery for a nerve block injection, a trigger point injection, and a lumbar epidural injection that all did not legitimately qualify as "ambulatory surgery or procedures involving the use of anesthesia". These injections were performed by Sheikh on December 19, 2020, at Global Surgery, rather than at Sheikh's or NJ Pain's office. The self-referral violated the Codey Law because (a) the resulting injections did not qualify as "ambulatory surgery or procedures involving the use of anesthesia"; and (b) the injections were performed at Global Surgery, rather than at Sheikh's and NJ Pain's medical office. Even so

NJ Pain, Sheikh and Global Surgery billed GEICO for the injections, which were the product of an unlawful self–referral.

(iii)   On July 1, 2021, Sheikh purported to conduct a follow-up examination of an Insured named JP at NJ Pain. Billing for JP's examination was submitted to GEICO through NJ Pain. At the conclusion of JP's examination, Sheikh self-referred Parada to NJ Pain Global Surgery for multiple injections that all did not legitimately qualify as "ambulatory surgery or procedures involving the use of anesthesia". The injections were performed by Sheikh on July 24, 2021, at Global Surgery, Sheikh's ambulatory surgery center, rather than at Sheikh's or NJ Pain's office. The self-referral violated Codey Law because (a) the resulting injections did not qualify as "ambulatory surgery or procedures involving the use of anesthesia"; and (b) the injections were performed at Global Surgery, rather than at Sheikh's NJ Pain medical office. Even so Sheikh and Global Surgery billed GEICO for the injections, which were the product of an unlawful self–referral.

(iv)   On October 28, 2021, Sheikh purported to conduct a follow-up examination of an insured named RM at 154 Stelton Road, Piscataway, New Jersey. Billing for RM's examination was submitted to GEICO through NJ Pain. At the conclusion of RM's examination, Sheikh self-referred RM to Global Surgery for two nerve block injections and a lumbar epidural injection that all did not legitimately qualify as "ambulatory surgery or procedures involving the use of anesthesia". These injections were performed by Sheikh on November 6, 2021, at Global Surgery, Sheikh's ambulatory surgery center, rather than at Sheikh's NJ Pain office. The self-referral violated the Codey Law because (a) the resulting injections did not qualify as "ambulatory surgery or procedures involving the use of anesthesia"; and (b) the injections were performed at Global Surgery, rather than at Sheikh's and NJ Pain's medical office. Even so NJ Pain, Sheikh and Global Surgery billed GEICO for the injections, which were the product of an unlawful self–referral.

(v)   On May 27, 2022, Sheikh purported to conduct a follow-up examination of an Insured named HA at 377 Jersey Avenue, Suite 590, Jersey City, New Jersey. Billing for HA's examination was submitted to GEICO through NJ Pain. At the conclusion of HA's examination, Sheikh self-referred HA to Global Surgery for two nerve block injections, a trigger point injection and a steroid injection that all did not legitimately qualify as "ambulatory surgery or procedures involving the use of anesthesia". These injections were performed by Sheikh on June 18, 2022, a Global Surgery, Sheikh's ambulatory surgery center, rather than at Sheikh's NJ Pain office. The self-referral violated the Codey Law because (a) the resulting injections did not qualify as "ambulatory surgery or procedures involving the use of anesthesia"; and (b) the injections were performed at Global Surgery, rather than at Sheikh's NJ Pain medical office. Even so NJ Pain, Sheikh and Global Surgery billed GEICO for the injections, which were the product of an unlawful self–referral.

204.    These are only representative examples of Sheikh's illegal self-referrals to Global Surgery Center.

**G.    Defendants' Medically Unnecessary Drug Screens and Unlawful Self-Referrals to Active Medical**

205.    As a component of the Defendants' fraudulent treatment and billing scheme, Active Medical and Sheikh submitted a massive amount of fraudulent billing to GEICO for medically unnecessary drug screens.

206.    In a legitimate clinical setting, drug screens may be medically warranted to determine whether a patient is taking any unreported medications or illicit drugs that might be relevant to some aspect of the patient's treatment plan, such as prescription drugs or anesthesia.

207.    However, absent some indication that a patient is abusing drugs, or a legitimate question regarding the medications that a patient is taking, there generally will be no medical need to administer drug screens to patients.

208.    To the extent that there is some legitimate need for drug screens, the drug screens should be appropriately tailored to each patient's individual circumstances and presentation. It is inappropriate to routinely order a substantially identical, extensive series of drug screens for patients, without regard for their personal circumstances.

209.    In a legitimate clinical setting, "quantitative" drug screens – which can tell how much of a drug is in a patient's system – sometimes may be medically necessary to confirm the results of "qualitative" drug screens, which can tell whether a patient is positive or negative for a given class of drug, but which do not set forth how much of a drug is in a patient's system.

210.    However, where a patient's qualitative drug screen comes up negative for a given class of drug, there will be no medical necessity to test for that same class of drug using a quantitative drug screen.

211. In virtually all of the claims for drug screens identified in Exhibit "2", there was no indication that the Insureds were abusing drugs, and there was no legitimate question regarding the medications that the Insureds were taking.

212. Nor was there any legitimate medical need to conduct both qualitative testing and quantitative testing on the Insureds in the claims identified in Exhibit "2" before the results of qualitative testing demonstrated a need for confirmatory quantitative testing.

213. Even so, in the claims identified in Exhibit "2", Active Medical and Sheikh routinely purported to simultaneously provide a massive number of medically unnecessary qualitative and quantitative drug tests to individual Insureds.

214. In order to bill GEICO for the medically unnecessary drug testing, Active Medical and Sheikh needed licensed health care providers to order the drug screens.

215. However, because there was no medical necessity for the drug testing, no legitimate health care providers would refer their patients for the drug screens.

216. Accordingly, to increase the number of charges for medically unnecessary drug testing that they could submit or cause to be submitted to GEICO, NJ Pain and Sheikh orchestrated patterns of unlawful self-referrals to Active Medical for medically unnecessary drug screens.

217. Even if Sheikh could lawfully self-refer Insureds to Active Medical in the first instance, Sheikh did not disclose his ownership interest in Active Medical when referring the Insureds to receive medically unnecessary drug screens at Active Medical. Nor did Sheikh inform the Insureds of their "right to utilize a specifically identified alternative health care provider…" which most certainly was available.

218.    Nonetheless, Sheikh routinely and unlawfully self-referred GEICO Insureds to Active Medical to receive medically unnecessary drug screens, including but not limited to the following self-referrals of the following Insureds:

(i)    On October 25, 2018, Sheikh unlawfully self-referred an Insured named DM to Active Medical for medically unnecessary drug screens.

(ii)    On January 10, 2019, Sheikh unlawfully self-referred an Insured named TE to Active Medical for medically unnecessary drug screens.

(iii)    On May 14, 2019, Sheikh unlawfully self-referred an Insured named NR to Active Medical for medically unnecessary drug screens.

(iv)    On July 25, 2019, Sheikh unlawfully self-referred an Insured named SI to Active Medical for medically unnecessary drug screens.

(v)    On October 24, 2019, Sheikh unlawfully self- referred an Insured named MP to Active Medical for medically unnecessary drug screens.

(vi)    On February 19, 2020, Sheikh unlawfully self- referred an Insured named IS to Active Medical for medically unnecessary drug screens.

(vii)    On July 7, 2020, Sheikh unlawfully self- referred an Insured named SB to Active Medical for medically unnecessary drug screens.

(viii)    On August 5, 2020, Sheikh unlawfully self- referred an Insured named JA to Active Medical for medically unnecessary drug screens.

(ix)    On October 1, 2020, Sheikh unlawfully self- referred an Insured named JW to Active Medical for medically unnecessary drug screens.

(x)    On October 5, 2020, Sheikh unlawfully self- referred an Insured named SA to Active Medical for medically unnecessary drug screens.

(xi)    On October 16, 2020, Sheikh unlawfully self- referred an Insured named NS to Active Medical for medically unnecessary drug screens.

(xii)    On September 24, 2021, Sheikh unlawfully self- referred an Insured named MT to Active Medical for medically unnecessary drug screens.

(xiii)    On December 2, 2021, Sheikh unlawfully self- referred an Insured named RM to Active Medical for medically unnecessary drug screens.

(xiv)    On February 21, 2022, Sheikh unlawfully self- referred an Insured named AB to Active Medical for medically unnecessary drug screens.

(xv)    On March 31, 2022, Sheikh unlawfully self-referred an Insured named SY to Active Medical for medically unnecessary drug screens.

219.    These are only representative examples of Sheikh's illegal self-referrals to Active Medical for medically unnecessary drug screens.

## H.    The Fraudulent Charges for EDX Tests That Were Never Legitimately Conducted in the First Instance

220.    Based upon the fraudulent, pre-determined findings and diagnoses provided during the Defendants' initial and follow-up examinations, and the Defendants' unlawful referral scheme, NJ Pain and Sheikh purported to subject many of the Insureds in the claims identified in Exhibit "1" to a series of medically unnecessary EDX tests, specifically nerve conduction velocity ("NCV") tests and electromyography ("EMG") tests.

221.    As set forth in Exhibit "1", NJ Pain and Sheikh then billed the EDX tests to GEICO under CPT codes 95886, 95887, 95911, 95912 and/or 95913.

222.    In the claims for EDX tests identified in Exhibit "1", the charges for the EDX tests were fraudulent in that the EDX were never legitimately conducted in the first instance.

223.    Moreover, in the claims for EDX tests identified in Exhibit "1", the charges for the EDX tests were fraudulent in that they misrepresented NJ Pain and Sheikh's eligibility to collect PIP Benefits in the first instance.

224.    In fact, NJ Pain and Sheikh never were eligible to collect PIP Benefits in connection with the claims identified in Exhibit "1", because – as a result of the fraudulent and unlawful conduct described herein – NJ Pain and Sheikh, and the purported EDX tests, were not in compliance with all significant laws and regulations governing health care practice and/or licensing laws in New York and New Jersey.

1.     **The Human Nervous System and Electrodiagnostic Testing**

225.    The human nervous system is composed of the brain, spinal cord, spinal nerve roots, and peripheral nerves that extend throughout the body, including through the arms and legs and into the hands and feet. Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

226.    The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves. The peripheral nervous system consists of both sensory and motor nerves. They carry electrical impulses throughout the body, from the spinal cord and extending, for example, into the hands and feet through the arms and legs.

227.    The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots. A "pinched" nerve root is called a radiculopathy, and can cause various symptoms including pain, altered sensation, altered reflexes on examination, and loss of muscle control.

228.    EMG and NCV tests are forms of EDX tests, and purportedly were provided by NJ Pain and Sheikh because they were medically necessary to determine whether the Insureds had radiculopathies.

229.    The American Association of Neuromuscular Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely

to the scientific advancement of neuromuscular medicine, has published a report regarding how to report the results of needle EMG and nerve conduction studies.

230.    In a legitimate clinical setting, a complete written report of the test results is required as part of the EDX examination.

231.    The AANEM states that the presentation of the data is "an essential part of the EDX examination." It is improper for a physician, upon completion of testing, to provide only conclusions, without the supporting data.

232.    What is more, a proper report should include (i) a description of the patient's clinical problem; (ii) the EDX tests performed; (iii) all relevant data derived from these tests; and (iv) the diagnostic interpretation of the data.

233.    Specifically, a report following an NCV test should include (i) the name of each nerve tested; (ii) right or left side designation; (iii) site of stimulation and pick-up; and (iv) amplitude and latency measurements.

234.    What is more, a report following a needle EMG test should include (i) the name and side (left or right) of each muscle examined; (ii) a description of insertional activity; (iii) the presence or absence of spontaneous activity; and (iv) assessment of the potentials generated with voluntary activity.

**2.    NJ Pain and Sheikh's Fraudulent EDX Testing**

235.    In the claims identified in Exhibit "1", NJ Pain and Sheikh purported to provide Insureds with EDX tests, including EMG and NCV tests, for which they submitted billing through NJ Pain to GEICO.

236.    The charges that NJ Pain and Sheikh submitted for the EDX tests falsely represented that the tests were legitimately performed in the first instance.

237.    In keeping with the fact that EDX tests were never legitimately performed in the first instance, NJ Pain and Sheikh, in most cases, did not include a description of the Insured's clinical problems, identify the EDX tests being performed, record any relevant data derived from the test, or include any sort of diagnostic interpretation of the data.

238.    For example:

(i)    On August 28, 2018, NJ Pain and Sheikh purported to provide between eighteen and twenty NCV tests and four EMG tests to an Insured named MI. However, NJ Pain and Sheikh did not legitimately provide the EDX tests to MI, inasmuch as they did not prepare any report containing a description of the Insured's clinical problems, identifying the EDX tests being performed, recording any relevant data derived from the test, or including any sort of diagnostic interpretation of the data.

(ii)    On June 3, 2021, NJ Pain and Sheikh purported to provide between eleven and twelve NCV tests and three EMG tests to an Insured named JB. However, NJ Pain and Sheikh did not legitimately provide the EDX tests to JB, inasmuch as they did not prepare any report containing a description of the Insured's clinical problems, identifying the EDX tests being performed, recording any relevant data derived from the test, or including any sort of diagnostic interpretation of the data.

(iii)    On June 3, 2021, NJ Pain and Sheikh purported to provide between eighteen and twenty NCV tests and three EMG tests to an Insured named JP. However, NJ Pain and Sheikh did not legitimately provide the EDX tests to JP, inasmuch as they did not prepare any report containing a description of the Insured's clinical problems, identifying the EDX tests being performed, recording any relevant data derived from the test, or including any sort of diagnostic interpretation of the data.

(iv)    On September 13, 2022, NJ Pain and Sheikh purported to provide thirteen or more NCV tests and two EMG tests to an Insured named MC. However, NJ Pain and Sheikh did not legitimately provide the EDX tests to MC, inasmuch as they did not prepare any report containing a description of the Insured's clinical problems, identifying the EDX tests being performed, recording any relevant data derived from the test, or including any sort of diagnostic interpretation of the data.

(v)    On September 13, 2022, NJ Pain and Sheikh purported to provide thirteen or more NCV tests and two EMG tests to an Insured named DD. However, NJ Pain and Sheikh did not legitimately provide the EDX tests to DD, inasmuch as they did not prepare any report containing a description of the Insured's clinical problems, identifying the EDX tests being performed, recording any relevant data derived from the test, or including any sort of diagnostic interpretation of the data.

239.    These are only representative examples of NJ Pain and Sheikh's fraudulent charges for EDX tests that were never legitimately conducted in the first instance.

### III.    The Fraudulent Billing Submitted to GEICO

240.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted hundreds of bills and treatment reports through NJ Pain and Active Medical containing thousands of fraudulent charges, seeking payment for the Fraudulent Services for which they were not entitled to receive payment.

241.    The bills and treatment reports were false and misleading in the following material respects:

(i)    The bills and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Defendants were in compliance with all significant statutory and regulatory requirements governing health care practice and/or licensing laws, and therefore were eligible to receive PIP reimbursement. In fact, for the reasons set forth herein, the Defendants were not in compliance with all significant statutory and regulatory requirements governing health care practice in New York and New Jersey and/or licensing laws, and therefore were not eligible to receive PIP reimbursement.

(ii)    The bills and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were provided in compliance with all significant statutory and regulatory requirements governing health care practice in New York and New Jersey and/or licensing laws, and therefore were eligible for PIP reimbursement. In fact, for the reasons set forth herein, the Fraudulent Services were not provided in compliance with all significant statutory and regulatory requirements governing health care practice in New York and New Jersey and/or licensing laws, and therefore were not eligible for PIP reimbursement.

(iii)    The bills and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed in the first instance. In fact, the Fraudulent Services frequently were not performed at all and, to the extent that they were performed, they were not medically necessary and were performed as part of a pre–determined fraudulent treatment, referral, and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to it.

(iv)    The bills and treatment reports submitted or caused to be submitted by the Defendants misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, the results of the Fraudulent Services, and the reimbursable amounts for the Fraudulent Services.

## IV.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

242.    The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

243.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

244.    For instance, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to a fraudulent, pre–determined protocol designed to maximize the charges that could be submitted, not to benefit the Insureds who supposedly were subjected to it.

245.    Likewise, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services frequently were never performed in the first instance.

246.    In addition, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were performed, to the extent that they are performed at all, pursuant to an illegal referral scheme.

247.    GEICO is under statutory and contractual obligations to promptly and fairly process claims. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and omissions described above, were

designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $933,221.

248.    Based upon the Defendants' material misrepresentations, omissions, and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### FIRST CAUSE OF ACTION
**Against NJ Pain and Active Medical**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

249.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 248 above.

250.    There is an actual case in controversy between GEICO and NJ Pain and Active Medical regarding more than $75,000.00 in unpaid billing for the Fraudulent Services that has been submitted to GEICO through NJ Pain and Active Medical.

251.    NJ Pain and Active Medical have no right to receive payment for any pending bills submitted to GEICO because of the fraudulent and unlawful activities described herein.

252.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that NJ Pain and Active Medical have no right to receive payment for any pending bills submitted to GEICO.

### SECOND CAUSE OF ACTION
**Against Sheikh**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

253.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 248 above.

254.    NJ Pain is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

255.    Sheikh knowingly conducted and/or participated, directly or indirectly, in the conduct of NJ Pain's affairs through a pattern of racketeering activities consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over five years seeking payments that NJ Pain was not entitled to receive because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre–determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants, and in many cases were not legitimately performed at all; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (iv) neither NJ Pain nor the underlying services were in compliance with applicable law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

256.    NJ Pain's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Sheikh operated NJ Pain, inasmuch as NJ Pain was not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for NJ pain to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants

continue to submit fraudulent billing to GEICO, and continue to attempt collection on the fraudulent billing submitted through NJ Pain to the present day.

257.    NJ Pain is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by NJ Pain in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

258.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $400,000.00 pursuant to the fraudulent bills submitted through NJ Pain.

259.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against NJ Pain and Sheikh**
**(Common Law Fraud)**

260.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 248 above.

261.    NJ Pain and Sheikh intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

262.    The false and fraudulent statements of material fact and acts of fraudulent concealment include:

(i)    in every claim identified in Exhibit "1" the representation that NJ Pain and Sheikh were in compliance with all significant laws and regulations governing health care practice and health care licensing, when in fact they were not;

(ii)     in every claim identified in Exhibit "1" the representation that NJ Pain and Sheikh were eligible to receive reimbursement, when in fact they were not;

(iii)    in every claim identified in Exhibit "1", concealment of the Defendants' fraudulent and unlawful activities.

(iv)    in every claim identified in Exhibit "1", the representation that the Fraudulent Services were medically necessary, and in some cases actually performed, when in fact the Fraudulent Services were not medically necessary, in some cases were not performed at all, and were performed – to the extent that they were performed at all – as part of a pre-determined fraudulent treatment and billing protocol designed to financially enrich NJ Pain and Sheikh, not to benefit the Insureds who supposedly were subjected to them; and

(v)     in every claim identified in Exhibit "1", the representation that the Fraudulent Services were provided in compliance with all significant laws and regulations governing health care practice and health care licensing, and were eligible for reimbursement, when in fact they were not.

263.    NJ Pain and Sheikh intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through NJ Pain that were not compensable.

264.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $400,000.00 pursuant to the fraudulent bills submitted by the Defendants through NJ Pain.

265.    NJ Pain and Sheikh's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

266.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**Against Sheikh and NJ Pain**
**(Unjust Enrichment)**

267.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 248 above.

268.    As set forth above, NJ Pain and Sheikh have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

269.    When GEICO paid the bills and charges submitted by or on behalf of NJ Pain, seeking payment under GEICO's New York no-fault insurance policies and the New York no-fault insurance laws, it reasonably believed that it was legally obligated to make such payments based on NJ Pain and Sheikh's improper, unlawful, and/or unjust acts.

270.    NJ Pain and Sheikh have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that NJ Pain and Sheikh voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

271.    NJ Pain and Sheikh's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

272.    By reason of the above, NJ Pain and Sheikh have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $400,000.00.

**FIFTH CAUSE OF ACTION**
**Against Sheikh**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

273.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 248 above.

274.    Active Medical is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

275.    Sheikh knowingly has agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Active Medical enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute,

18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more than five years seeking payments that NJ Pain was not entitled to receive because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre–determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants, and in many cases were not legitimately performed at all; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (iv) neither Active Medical nor the underlying services were in compliance with applicable law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

276.    Active Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Sheikh has operated Active Medical, inasmuch as Active Medical is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for Active Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Sheikh continues to submit fraudulent billing to GEICO, and continues to attempt collection on the fraudulent billing submitted through Active Medical to the present day.

277.    Active Medical is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These

inherently unlawful acts are taken by Active Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

278.    GEICO has been injured in its business and property by reason of the above–described conduct in that it has paid at least $500,000.00 pursuant to the fraudulent bills submitted through Active Medical.

279.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**SIXTH CAUSE OF ACTION**
**Against Active Medical and Sheikh**
**(Common Law Fraud)**

280.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 248 above.

281.    Active Medical and Sheikh intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

282.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim identified in Exhibit "2" the representation that Active Medical and Sheikh were in compliance with all significant laws and regulations governing health care practice and health care licensing, when in fact they were not; (ii) in every claim identified Exhibit "2", the representation that Active Medical and Sheikh were eligible to receive PIP Benefits, when in fact they were not; (iii) in every claim identified in Exhibit "2", concealment of the Defendants' fraudulent and unlawful activities; (iv) in every claim identified in Exhibit "2", the representation that the Fraudulent Services were medically necessary, and in some cases actually performed, when in fact the Fraudulent Services were not medically necessary, in some

cases were not performed at all, and were performed – to the extent that they were performed at all – as part of a pre-determined fraudulent treatment and billing protocol designed to financially enrich Active Medical and Sheikh, not to benefit the Insureds who supposedly were subjected to them; and (v) in every claim identified in Exhibit "2", the representation that the Fraudulent Services were provided in compliance with the laws and regulations governing health care practice, and were eligible for PIP reimbursement, when in fact they were not.

283.    Active Medical and Sheikh intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Active Medical that were not compensable.

284.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $500,000.00 pursuant to the fraudulent bills submitted by the Defendants through Active Medical.

285.    Active Medical and Sheikh's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

286.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### SEVENTH CAUSE OF ACTION
**Against Active Medical and Sheikh**
**(Unjust Enrichment)**

287.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 248 above.

288.    As set forth above, Active Medical and Sheikh have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

289.    When GEICO paid the bills and charges submitted or caused to be submitted by Active Medical and Sheikh through Active Medical for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

290.    Active Medical and Sheikh have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

291.    Active Medical and Sheikh's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

292.    By reason of the above, Active Medical and Sheikh have been unjustly enriched in an amount to be determined at trial, but in no event less than $500,000.00.

## JURY DEMAND

293.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against NJ Pain and Active Medical, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that NJ Pain and Active Medical have no right to receive payment for pending billing submitted to GEICO;

B.    On the Second Cause of Action against Sheikh, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $400,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.    On the Third Cause of Action against NJ Pain and Sheikh, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $400,000.00, together with

punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

D.      On the Fourth Cause of Action against NJ Pain and Sheikh, more than $400,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

E.      On the Fifth Cause of Action against Sheikh, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $500,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

F.      On the Sixth Cause of Action against Active Medical and Sheikh, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $500,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just proper; and

G.      On the Seventh Cause of Action against Active Medical and Sheikh, more than $500,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated: February 8, 2024

RIVKIN RADLER LLP

By:      _/s/ Max Gershenoff_____
Barry Levy, Esq.
Max Gershenoff, Esq.
Steven Henesy, Esq.
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3444
barry.levy@rivkin.com
max.gershenoff@rivkin.com
steven.henesy@rivkin.com